# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 35382

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

MICHAEL STEVEN REYNOLDS,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

2009 Opinion No. 55

Filed: July 28, 2009

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael E. Wetherell, District Judge.

Judgment of conviction for manufacturing a controlled substance and possession of drug paraphernalia, affirmed.

Molly J. Huskey, State Appellate Public Defender; Heather M. Carlson, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent.

_____

PERRY, Judge

Michael Steven Reynolds appeals from his judgment of conviction for manufacturing a controlled substance and possession of drug paraphernalia. Specifically, Reynolds challenges the district court's order denying his motion to suppress. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

Police officers responded to a one-story house after they received a call that a two-year-old child had died there from unknown causes. At the scene, emergency personnel discovered spoons with a methamphetamine residue on the bed of the child's parents, who were residing in the basement. An officer specializing in drug investigations was called to the home and smelled the odor of growing marijuana plants coming from one of two locked bedrooms on the main floor. Police suspected that drug use or production could have resulted in the child's death.

1

Responding to questioning, Reynolds told the narcotics officer that he lived in the room from which the marijuana smell was emanating, a roommate lived in the room across the hall from him, and the couple lived in the basement. The residents had access to the common areas of the home, but each room had keyed locks. There were no other indications that the rooms were separate rentals.

Reynolds told the officer that the smell coming from his room was caused by marijuana that he had smoked earlier that day. The officer noted the presence of potting soil outside the home and that Reynolds's window was covered with black plastic. The officer told Reynolds that the smell was consistent with growing marijuana plants, not burned marijuana, and asked if he could enter Reynolds's room. When Reynolds refused, the officer applied for a search warrant. The officer's affidavit for the search warrant detailed the evidence of methamphetamine usage discovered at the home as well as the smell of growing marijuana plants. The affidavit concluded that the presence of controlled substances was suspected to be a contributing factor in the death of the child. The affidavit sought, and the search warrant granted, authorization to search the entire house for evidence of the crimes of possession of methamphetamine, possession of marijuana, possession of paraphernalia, and injury to a child. The warrant specifically described the premises by giving the complete street address of the home and describing it as a single-family, single-story home with a basement residence. Additionally, the warrant described the home's color, the direction it faced, the placement of the street numbers near the front door, its location between the nearest cross streets, the presence of two specifically-identified cars in the driveway, and the presence of police officers at the scene.

The officer who had initially spoken to Reynolds and who applied for the search warrant also executed the warrant. During the search of Reynolds's bedroom, the officer found fifteen growing marijuana plants, fertilizer, growing lights, water, an instructional book about growing marijuana, eleven individually packaged plastic bags of marijuana, and numerous smoking pipes. Reynolds was charged with felony manufacturing a controlled substance, I.C. § 37-2732(a), and misdemeanor possession of drug paraphernalia, I.C. § 37-2734A.

Reynolds filed a motion to suppress the evidence seized from his bedroom. In support of his motion, Reynolds presented evidence, including an affidavit from his landlord, that the basement and each of the two main-level bedrooms were individually rented under separate rental contracts, with all renters having common use of the living room, kitchen, and bathroom.

2

Reynolds argued that the search warrant did not specify the place to be searched with sufficient particularity because it failed to identify separate subunits that the police sought to search. After a hearing, the district court denied Reynolds's motion to suppress. The district court held that a search of the entire home was reasonable to investigate the occupancy and possible causes of the child's death and that the officer did not know, nor should he have known, that the home was actually three separately rented subunits. Alternatively, the district court held that, even if the warrant was invalid, the search was justified by exigent circumstances. Reynolds entered a conditional guilty plea to felony manufacturing a controlled substance and misdemeanor possession of drug paraphernalia, reserving his right to appeal the denial of his motion to suppress. The district court sentenced Reynolds to a unified term of five years, with a minimum period of confinement of two and a half years, for manufacturing a controlled substance, and a concurrent 180 days for possession of drug paraphernalia. After a period of retained jurisdiction, the district court suspended Reynolds's sentence and placed him on probation for four years. Reynolds appeals.

## II.

## ANALYSIS

Reynolds argues that the district court erred by denying his motion to suppress. He contends that the search warrant did not contain a description of the place to be searched with sufficient particularity because what the warrant identified as a single-family residence was actually multiple subunits rented out to unrelated occupants. The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

The purpose of the Fourth Amendment guarantee of the right to be free from unreasonable searches and seizures is to safeguard the privacy of citizens by ensuring against the search of premises where probable cause is lacking. *State v. Yoder*, 96 Idaho 651, 653, 534 P.2d 771, 773 (1975); *State v. Young*, 136 Idaho 711, 714, 39 P.3d 651, 654 (Ct. App. 2002). One

3

such safeguard is the requirement that a search warrant describe with particularity the place to be searched. *Yoder*, 96 Idaho at 653, 534 P.2d at 773. The description must be sufficiently clear so that the place to be searched is recognizable from other neighboring properties. *Id.* The test for determining the sufficiency of the description of the place to be searched is whether the place is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another location might be mistakenly searched. *Young*, 136 Idaho at 715, 39 P.3d at 655.

In this case, the search warrant identified the place to be searched by street number and a detailed description, including the direction the home was facing, nearby cross streets, color, type, location of the address numbers near the front door, two vehicles in the driveway, and the presence of police officers. This description clearly identified a single-family home to be searched with sufficient particularity. However, Reynolds argues that it was not sufficient because the home was not, in fact, a single-family residence but was rented by three tenants who shared common space and had separately keyed rooms. Therefore, he contends that the home should have been treated as a multiunit structure and that the warrant was required to specifically identify which units within the building were being subjected to a search.

Idaho courts have not directly addressed the validity of a warrant to search a multiunit structure mistakenly identified as a single-family residence. Among various state and federal courts, the general rule is that a warrant authorizing the search of a multiunit structure will be invalidated if it does not identify the subunit to be searched with sufficient particularity to preclude a search of other units in the same building occupied by innocent persons. *See* WILLIAM E. RINGEL, 1 SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 5.5(b), p. 5-26.3 to 5-26.4 (2002) (identifying general rule and citing to numerous state and federal cases supporting the rule); *see also* 11 A.L.R. 3d 1330 (1967 & Supp. 2008). Therefore, if officers know or should know that there are multiple, separate dwelling units, they must exclude from a requested warrant those units that are not under suspicion. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). However, a warrant lacking this particularity will not be held invalid if the multiunit character of the structure was neither known nor externally apparent to the officers applying for and executing the warrant. 11 A.L.R. 3d at 1332-33; *see also United States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982) (recognizing an exception to the general rule if "the multiunit character of the premises was not known to the officers").

4

In *Garrison*, the Supreme Court of the United States upheld a search authorized by a warrant describing a single third-floor apartment even though there were, in fact, two third-floor apartments. The Court held that reasonable officers could not have known that the third floor was subdivided.

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search . . . . Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.

*Garrison,* 480 U.S. at 86-87.

> After a hearing on Reynolds's motion to suppress, the district court here found:
>
> [The officer] said there were two bedrooms on the main level of the home and a basement. The two main floor bedrooms were locked, in that the door knobs on the doors to these rooms were locked. . . . There was no indication from anything inside or outside of the house that indicated that it was a boarding house, according to [the officer]. . . .
>
> [The officer] testified that [Reynolds] said that the bedroom where the odor was coming from was his and he refused to allow the police to search the room, saying that they needed a warrant. [Reynolds] told [the officer] that he had roommates in the house.
>
> According to [the officer], none of the residents were at the house when the search was conducted and a copy of the search warrant was left at the house. [The officer] searched both bedrooms and he searched [Reynolds's] bedroom by using a key, which had been left with the police by [Reynolds].
>
> . . . .
>
> [The officer] said he had no indication, prior to obtaining the search warrant, that this house was a boarding house. He did know that there were several people living in the house. [The officer] said it was not uncommon to find locked doors in a single family residence.
>
> . . . .
>
> [Reynolds] testified that he had a rental agreement to rent his bedroom and that he also had access to the common areas, but the other bedroom was rented to another man and the basement was rented to a couple.
>
> . . . .
>
> [Reynolds] said that he specifically told [the officer] about the rental arrangement in the house, but he later conceded that he recognized no distinction between the terms "roommates" and "renters" and he later indicated that his conversation with [the officer] concerning the rental arrangement in the house

may have consisted of nothing more than telling him who resided in the various bedrooms.

> [Reynolds] testified that all residents had free access to the bathroom, kitchen, and the living room. [Reynolds] testified that all residents also had access to the residence by the entry doors and they all had keys to those doors. [Reynolds] said that . . . there were no individual designations on the doors or any other designations in or outside the house to indicate that the bedrooms were separately rented.

The district court also found:

> In addition, [the officer] testified, and the court credits his testimony, that he did not know that the residence was a boarding house. [Reynolds's] own testimony was unclear concerning the detail he provided [the officer] concerning the contractual arrangements of the bedroom rentals and the court believes that he simply told [the officer] that he was an occupant of the house along with his other roommates and he testified that he did not "specifically clarify at all if [he] had access to anybody else's rooms." [Reynolds] also, apparently, had not been truthful with [the officer] concerning what was actually present in his room, which [the officer] suspected, making it reasonable for [the officer] to be skeptical regarding other statements he made. Indeed, during the hearing, [Reynolds] admitted that when he was being questioned by [the officer], he was not honest when he answered some of his questions and he believed it was up to him whether or not he answered [the officer's] questions truthfully.

Based on these findings, the district court concluded that the officer did not know, nor should he have known, that the home was in fact a multiunit structure and not a single-family residence. Therefore, the district court held that the warrant and subsequent search were valid and Reynolds's motion to suppress must be denied.

Reynolds does not challenge the district court's findings as not supported by substantial evidence in the record. Rather, Reynolds points out testimony from the hearing on the motion to suppress that support his contention that the officer knew or should have known that the home was a multiunit structure. Reynolds argues the officer testified that he knew other people were living in the house and that Reynolds's door was locked. Reynolds also presents various statements that he made while testifying regarding his explanation to the officer about the living arrangements before the search warrant was issued. This evidence was all considered by the district court in its findings. The district court found Reynolds's testimony to be confusing and lacking in credibility and, moreover, the district court found credible the officer's testimony that he did not know the multiunit nature of the home. In fact, the warrant authorized the search of

6

the home, in part, for indicia ownership and occupancy. Therefore, the district court's findings of fact are supported by substantial evidence.

In the present case, as in *Garrison*, the officer had no knowledge at the time he applied for the search warrant that the home was anything other than a single-family residence with several occupants. The only external indication that there may have been subdivided units was the presence of locks on the doors--which the officer testified was not uncommon in single residences occupied by several people. Beyond the fact that there were locks on the doors, all the occupants shared common entrances and common areas, there was no evidence of separate utilities or mailboxes, and there were no individual markings on the doors. In short, there was very little, if anything, to create a belief that these were separate subunits. Therefore, the district court was justified in finding that the officer did not know, nor should have known, that the home was actually a multiunit structure. Accordingly, the district court did not err by denying Reynolds's motion to suppress the evidence obtained from his bedroom. Because we uphold the search on this basis, we need not address the district court's alternative holding that the search of the entire house was justified, even without a warrant, by exigent circumstances.

### III.
### CONCLUSION

The officer did not know, nor should he have known, that the home to be searched was a multiunit structure and not a single-family residence. Therefore, the warrant describing the place to be searched by street address and physical description was sufficiently particular, despite its failure to identify specific rooms to be searched. Thus, the district court did not err by denying Reynolds's motion to suppress. Accordingly, Reynolds's judgment of conviction for manufacturing a controlled substance and possession of drug paraphernalia is affirmed.

Chief Judge LANSING and Judge GUTIERREZ, **CONCUR.**