**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 37683**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2011 Opinion No. 41** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: July 18, 2011** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **MATTHEW T. HARPER,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Carl B. Kerrick, District Judge.

Judgment of conviction for trafficking in amphetamine and/or methamphetamine by manufacturing and manufacture or delivery of a controlled substance where children are present, affirmed.

Clark and Feeney, LLP, Lewiston, for appellant. Jonathan D. Hally argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

———————————————————————

GUTIERREZ, Judge

Matthew T. Harper appeals from the district court's entry of a judgment of conviction upon jury verdicts finding him guilty of trafficking in amphetamine and/or methamphetamine by manufacturing and for manufacture or delivery of a controlled substance where children are present. Specifically, he asserts that the district court erred in denying his motion to suppress because the affidavit in support of the search warrant did not establish the requisite probable cause and because the search warrant was constitutionally defective. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

After receiving information from pharmacy employees that Harper, Bradley Stinson, and Ashley Wolff had been purchasing precursors for manufacturing methamphetamine, Detective

1

Bryce Scrimsher and other law enforcement officers conducted an investigation between August 2008 and March 2009. During the investigation, officers conducted surveillance on a residence located at 1536 Airway Avenue in Lewiston, Idaho, a single-family house owned by Bradley Stinson, where officers believed that Harper also resided. Over the course of the investigation, law enforcement received reports from employees of various pharmacies in town, and in several instances confirmed the information themselves, that Harper, Stinson, and Wolff had collectively purchased, each to varying degrees, over 7,000 pseudoephedrine tablets and other methamphetamine precursors.

Based on information provided by Detective Scrimsher in an affidavit, a magistrate issued a warrant authorizing the search of: (1) the residence located at 1536 Airway Avenue; (2) Harper's and Stinson's vehicles and any other vehicles found at the residence when the warrant was executed; (3) a storage unit where officers had observed Harper and Stinson frequenting; and (4) the "persons" of Harper, Stinson, Wolff, and "any and all other persons at the residence" when the warrant was executed. The warrant also specified items that could be seized, including, but not limited to, ledgers, methamphetamine precursors, equipment used in the manufacture of methamphetamine, and documents demonstrating ownership and residence.

When officers executed the warrant, they encountered the four residents of the house, Stinson, Harper, Wolff, and Wolff's two-year-old son. Stinson and Wolff resided in a bedroom upstairs and Harper resided in a bedroom on the main level. Harper and Stinson both testified at the hearing on Harper's motion to suppress that Harper had objected to the search of his room, telling the officers that he paid rent and had a separate lock on his door, and therefore they needed a separate warrant to conduct the search. Officers proceeded to search Harper's room and found a number of items used to manufacture methamphetamine, along with methamphetamine and other drug paraphernalia. Harper subsequently admitted he had been "cooking meth" at the 1536 Airway Avenue residence for approximately a year and a half.

Harper was charged by information with trafficking in amphetamine and/or methamphetamine by manufacturing, Idaho Code § 37-2732B(a)(3), and manufacture or delivery of a controlled substance where children are present, I.C. § 37-2737A. He filed a motion to suppress the evidence obtained during the search, alleging the affidavit which formed the basis of the warrant failed to establish probable cause and that the search warrant was constitutionally defective because it lacked the requisite particularity. After a hearing, the district court denied

the motion to suppress. Harper filed a motion to reconsider, which the district court also denied. The case proceeded to a jury trial where a jury subsequently found him guilty as charged. Harper now appeals the district court's denial of his motion to suppress.

## II.

## ANALYSIS

Harper contends that the district court erred in denying his motion to suppress the evidence found as a result of the execution of the search warrant on two bases: (1) the affidavit for the search warrant failed to establish the requisite probable cause because it was vague, lacking in detail, contained hearsay, and failed to provide a sufficient nexus between any alleged wrongdoing and the premises and persons subject to the search; and (2) the search warrant was constitutionally defective in that it was overly broad in allowing a search of the entire residence when the officers knew that it was a multi-unit residence. Thus, Harper contends that, because the warrant was invalid, the search and seizure of evidence violated his federal and state Fourth Amendment rights.

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

### A.      Probable Cause

Harper first argues that the district court erred when it denied his motion to suppress the evidence found during the officers' search of his room because the affidavit supporting the request for a search warrant failed to establish the requisite probable cause. Specifically, he contends the affidavit contained insufficient detail as it consisted of "unsubstantiated and conclusory statements" rooted in "unreliable hearsay" and it failed to establish the requisite nexus between any criminal activity, the things to be seized, and the place and persons to be searched.

3

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 17, of the Idaho Constitution is virtually identical to the Fourth Amendment, except that "oath or affirmation" is termed "affidavit." In order for a search warrant to be valid, it must be supported by probable cause to believe that evidence or fruits of a crime may be found in a particular place. *State v. Josephson*, 123 Idaho 790, 792-93, 852 P.2d 1387, 1389-90 (1993); *State v. Belden*, 148 Idaho 277, 280, 220 P.3d 1096, 1099 (Ct. App. 2009). When determining whether probable cause exists:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). *See also State v. Wilson*, 130 Idaho 213, 215, 938 P.2d 1251, 1253 (Ct. App. 1997). A magistrate need only determine that it would be reasonable to seek the evidence in the place indicated in the warrant, not that the evidence sought is there in fact, or is more likely than not to be found, where the search takes place. *State v. O'Keefe*, 143 Idaho 278, 287, 141 P.3d 1147, 1156 (Ct. App. 2006); *State v. Fairchild*, 121 Idaho 960, 966, 829 P.2d 550, 556 (Ct. App. 1992).

When probable cause to issue a search warrant is challenged on appeal, the reviewing court's function is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238-39; *Belden*, 148 Idaho at 280, 220 P.3d at 1099. In this evaluation, great deference is paid to the magistrate's determination. *Gates*, 462 U.S. at 236; *Wilson*, 130 Idaho at 215, 938 P.2d at 1253. The test for reviewing the magistrate's action is whether he or she abused his or her discretion in finding that probable cause existed. *State v. Holman*, 109 Idaho 382, 387, 707 P.2d 493, 498 (Ct. App. 1985). On appeal, our review of the magistrate's decision to issue the warrant is conducted with due regard for, but independently from, the district court's decision. *State v. Chandler*, 140 Idaho 760, 762, 101 P.3d 704, 706 (Ct. App. 2004). When a search is conducted pursuant to a warrant, the burden of proof is on the

4

defendant to show that the search was invalid. *State v. Kelly*, 106 Idaho 268, 275, 678 P.2d 60, 67 (Ct. App. 1984).

### 1. Specificity

Initially, we address Harper's contention that the affidavit did not establish probable cause because it was "rife with conclusory statements" and based on hearsay. It is well settled that hearsay information may be included in an affidavit in support of probable cause providing that there is a substantial basis for crediting the hearsay. I.C.R. 4(e); *State v. Elison*, 135 Idaho 546, 549-50, 21 P.3d 483, 486-87 (2001); *State v. Carlson*, 134 Idaho 471, 476, 4 P.3d 1122, 1127 (Ct. App. 2000). In adopting the "totality of the circumstances" test in *Gates*, the United States Supreme Court abandoned a previous standard developed in *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969), which required that the government demonstrate both the informant's veracity and the informant's basis of knowledge. *Chandler*, 140 Idaho at 762, 101 P.3d at 706. In *State v. Chapple*, 124 Idaho 525, 528, 861 P.2d 95, 98 (Ct. App. 1993), we explained the effect of the *Gates* decision:

> [T]he Court did not completely abandon the two-pronged test of *Aguilar-Spinelli* but suggested that the two prongs are closely intertwined, so that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." [*Gates*], 462 U.S. at 233, 103 S. Ct. at 2329. Thus, while the "totality of the circumstances" has eliminated the rigid requirements of "veracity" and "basis of knowledge" derived from the *Aguilar-Spinelli* decisions, these standards remain a useful first step in evaluating probable cause where the information is derived, at least in part, from an undisclosed informant. *State v. Prestwich*, 110 Idaho 966, 719 P.2d 1226 (Ct. App. 1986); *State v. Schaffer*, 107 Idaho 812, 817, 693 P.2d 458, 463 (Ct. App. 1984).

While acknowledging that hearsay is allowed to be included in search warrant affidavits, Harper contends that the affidavit still needs to provide sufficient information to allow the magistrate to determine the reliability and veracity of the source, which he contends was not included here. He argues that, due to the affiant's failure to identify the people he spoke to at the pharmacies or the basis of those sources' information, the magistrate "could not possibly have determined the 'veracity' and 'basis of knowledge' of persons supplying hearsay information and thus, the statements lack sufficient credibility to justify a finding of probable cause."

In *Chandler*, 140 Idaho 760, 101 P.3d 704, we discussed the reliability and veracity of informants whose names had not been disclosed in the affidavit. Initially, we noted that, where

5

the information has come from a "citizen informant," disclosure of the person's name and address will ordinarily be sufficient to show the informant's veracity and reliability. *Id*. at 763, 101 P.3d at 707. We then pointed out that an informant whose identity is known to the police is not to be treated as an anonymous tipster even if the informant's name is not disclosed to the magistrate:

> [An appellant's] initial assertion . . . that the informant's identity was not known to the magistrate, even if it were supported by the record, would be of no significance. It is not whether the *magistrate* was aware of an informant's identity, but whether *law enforcement officials* knew the identity, that is important. An informant will know that if law enforcement personnel are aware of his or her identity, negative consequences can flow from the provision of false information. An informant cannot possibly foresee, at the time of giving information to police officers, whether the officers will disclose his or her identity to a magistrate, and therefore the presence or absence of such disclosure cannot possibly affect the informant's truthfulness.

*Id.* We then concluded that, while the informants in *Chandler* were "confidential" in the sense that police had not disclosed their identity, they were not anonymous because their identity was known to police; they gave their information during in-person interviews and risked accountability to the police if they provided false information. *Id.* In addition, we noted that the informants corroborated each other and that each had a reliable basis of knowledge, having gained the knowledge reported to police through direct contact with Chandler and/or direct observation of drugs at his residence. *Id*. at 764, 101 P.3d at 708. *See also Carlson*, 134 Idaho at 476, 4 P.3d at 1127 (holding that personal observation by an informant is one of the strongest possible indications of reliability and that information may be sufficiently reliable to support a probable cause finding if the information is corroborated by independent evidence).

As to this case, we note that Harper's contention that the officer was required to provide the names and sources of information of the pharmacy employees in order to prove the veracity and reliability of the information they conveyed to law enforcement is contrary to the practical, common-sense approach mandated by *Gates*. Rather, as opposed to a requirement that informants be identified, we consider the totality of the circumstances. Like in *Chandler*, the identities of the pharmacy employees were known to law enforcement and thus, those employees risked accountability if they provided false information. In addition, as pointed out by the state, there is no indication how disclosure of the pharmacy employees' names would aid in the

magistrate's determination of whether the information they provided was accurate and sufficient to form the basis of a probable cause determination. Further, Harper's assertion that the employees' basis of knowledge was not disclosed is unavailing; it is clear that these employees obtained this information due to the fact that they were employed at the pharmacies where Harper and the others purchased methamphetamine precursors. Finally, like in *Chandler*, the information provided by the informants that Harper, Stinson, and Wolff were frequently purchasing pseudoephedrine was corroborated by various employees from various pharmacies and by the officers' own examination of pharmacy logs. Thus, we disagree that the magistrate was required to disregard this information as unreliable hearsay as there was substantial basis to find it credible.

Harper also contends that "nearly every single statement of [Detective] Scrimsher's which identifies that products containing pseudoephedrine were purchased are conclusory statements" that were not independently verifiable and thus should not have been considered by the magistrate in its probable cause determination. While Harper is correct that the affidavit in support of a warrant must relate facts, not simply the conclusions that may be drawn from those facts, *State v. Guzman*, 122 Idaho 981, 984, 842 P.2d 660, 663 (1992), such is not the case here. Detective Scrimsher indicated that he and his colleagues were informed by numerous pharmacy employees that Harper was purchasing pseudoephedrine that he obtained in their respective pharmacies and that Detective Scrimsher had personally observed the names of all three as having bought pseudoephedrine at Walgreens, Rite-Aid, and Wal-Mart in those stores' respective written pseudoephedrine logs. That the basis of this knowledge could have been clearer is not the standard--it is sufficient that Detective Scrimsher identified that he had obtained this knowledge from pharmacy personnel, whom it is safe to assume are familiar with the substance and can identify when it is being purchased, and from his identification of the suspects' names in written pharmacy records. Accordingly, the magistrate was not required to disregard this evidence as merely conclusory statements in its determination of probable cause.

### 2. Requisite nexus

Harper also contends that the affidavit failed to establish the requisite nexus between the alleged criminal activity, the items sought, and the residence and persons searched. More specifically, the affidavit indicates that the residence searched was owned by Stinson, but does not identify Stinson as having purchased pseudoephedrine. Additionally, while the affidavit

7

states that Harper purchased the substance, it fails to establish that he resided at the residence searched as it only referenced him being observed at the residence three times over a 440-day period. Likewise, Harper contends that there was no nexus between Wolff's alleged criminal conduct and the residence searched. Finally, he contends there was no evidence that any purchased pseudoephedrine was ever brought to the residence that was the subject of the search.

Probable cause to search requires a nexus between criminal activity and the item to be seized, and a nexus between the item to be seized and the place to be searched. U.S. Const. amend. IV; *State v. Yager*, 139 Idaho 680, 686, 85 P.3d 656, 662 (2004); *Belden*, 148 Idaho at 280, 220 P.3d at 1099. Most courts require that a nexus between the items to be seized and the place to be searched must be established by specific facts, and an officer's general conclusions are not enough. *Yager*, 139 Idaho at 686, 85 P.3d at 662; *Belden*, 148 Idaho at 280, 220 P.3d at 1099. Nonetheless, even though criminal objects are not tied to a particular place by any direct evidence, an inference of probable cause to believe that they would be found in that place can be reasonable. *O'Keefe*, 143 Idaho at 287, 141 P.3d at 1156; *Fairchild*, 121 Idaho at 966, 829 P.2d at 556. A magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense. *Belden*, 148 Idaho at 280, 220 P.3d at 1099; *O'Keefe*, 143 Idaho at 287, 141 P.3d at 1156. Moreover, the magistrate may take into account the experience and expertise of the officer conducting the search in making a probable cause determination. *O'Keefe*, 143 Idaho at 287, 141 P.3d at 1156. In determining there was the requisite nexus, the district court stated that, considering the totality of the circumstances, the affidavit in support of the warrant documented that "large quantities" of pseudoephedrine where being purchased by the occupants of the Airway Avenue residence as well as "other indicia" of items used to manufacture methamphetamine.

Initially, we note that Harper is incorrect in contending that the affidavit did not include allegations that Stinson had purchased pseudoephedrine. Detective Scrimsher explicitly alleged in multiple paragraphs of the affidavit that Stinson had purchased the substances as well as other methamphetamine components. In addition, Harper expends considerable effort arguing that there was no nexus between the allegation of his criminal conduct stemming from his purchase of pseudoephedrine and the residence because the affidavit consistently refers to the residence as "Stinson's residence" and only once refers to it as Harper's residence. He argues that the affidavit only references his being present at the residence on three occasions over a 440-day

8

period and that his car was there several times over this period. Overall, he contends, the affidavit read as a whole indicates that he was, at most, an occasional guest. We do not agree that this is the only proper interpretation of the statements in the affidavit. In fact, the affidavit refers to the Airway Avenue home as Harper's residence in at least four instances. Specifically, in reference to the Airway Avenue residence, paragraphs eight and eleven of the affidavit state that "Harper left his residence;" paragraph seventeen indicates that in his vehicle, Harper "turned south and travelled back to Airway Avenue and turned east to go to his residence;" and paragraph twenty-eight states that after leaving Walgreens and stopping by a storage unit, Harper "went back home." In addition, Harper's presence was noted at the house on various other occasions--including three times where he left the residence and purchased pseudoephedrine at numerous pharmacies, before, on at least two occasions, returning to the residence. Contrary to Harper's seeming implication, the affidavit referencing the house as "Stinson's residence" is not mutually exclusive to the officers believing that Harper lived there as well--especially where it was asserted by Detective Scrimsher on at least four occasions that it was also Harper's residence.[1] The affidavit allowed the magistrate to draw a reasonable inference that evidence regarding the alleged drug activity was likely to be found at the residence.[2]

### 3. Totality of the circumstances

Having established that there was a requisite nexus, and that the magistrate could properly take into account the entirety of the affidavit, we now examine whether the totality of the circumstances supported a conclusion that there existed the requisite probable cause to search

---

[1]     That there was no allegation that Harper had ever delivered any pseudoephedrine to the residence is not dispositive. It is well settled where there is probable cause to believe than an individual is trafficking in illegal drugs, it is reasonable to infer that the suspected trafficker keeps evidence of his or her activities in his residence. *O'Keefe*, 143 Idaho at 287-88, 141 P.3d at 1156-57. Here, the affidavit alleged that Harper, Stinson, and Wolff had collectively purchased large amounts of pseudoephedrine (including over 7,000 tablets over a ten-month period), such that there was probable cause of more than personal drug use, and thus, it was reasonable to assume that evidence would be found at what was identified as Harper's and Stinson's residence.

[2]     Harper also contends that the requisite nexus between Wolff's alleged criminal activity and the residence was not established. However, Wolff is not a party to this appeal and as the State points out, even if the affidavit is insufficient to establish that Wolff lived at the residence, such a deficiency would be irrelevant to the finding of probable cause in regard to Harper because the search of the residence was not based on her supposed actions alone.

the residence. In support of his request for a warrant, in relevant part, Detective Scrimsher averred that he commenced his investigation on August 15, 2008, after being notified by employees of a Walgreens pharmacy that Stinson had been coming in two to three times a week and purchasing two bottles of iodine tincture, a known component of methamphetamine. Occasionally, Wolff accompanied him and also purchased two bottles of iodine tincture. Detective Scrimsher followed up on this information, contacting several pharmacies and learning that Stinson had been purchasing pseudoephedrine and other methamphetamine components from Rite-Aid, Walgreens, and Wal-Mart. After identifying Stinson's residence at 1536 Airway Avenue, Detective Scrimsher saw a car at the residence registered to Harper. This car was seen at the residence on several subsequent occasions and it is apparent from the affidavit that Detective Scrimsher believed that Harper lived at the residence. Detective Scrimsher also saw several other components commonly used to manufacture methamphetamine outside the residence.

In November 2008, Detective Scrimsher confirmed that Harper and Wolff had been frequently purchasing pseudoephedrine from Rite-Aid and other pharmacies in the area. He then received a copy of the "pseudoephedrine logs" from three different pharmacies, which indicated that from January 1, 2008, through November 10, 2008, Stinson, Harper, and Wolff had collectively purchased over 7,000 pseudoephedrine tablets, which based on his training and experience would make approximately one-half pound of methamphetamine.

Over the following month, Detective Scrimsher averred that he received "several" phone calls from pharmacies that Wolff, Stinson, and Harper had been continuing to purchase pseudoephedrine. He also indicated that he continued to see Harper's car in the driveway of the Airway Avenue residence. On December 15, officers watched as Harper left the residence and went to Rite-Aid; Albertsons; Wal-Mart, where they later confirmed that he purchased pseudoephedrine; and a Chevron gas station where he purchased approximately two bottles of "Heet," a known methamphetamine component. The officers then watched as Harper drove back toward the Airway Avenue residence.

Officers again watched on January 12, 2009, as Harper left the Airway Avenue residence and went to Wal-Mart; to Albertsons, where he was observed in the pharmacy department; to Rite-Aid; to Walgreens; to a storage unit; and then went "back home." Detective Scrimsher later confirmed that Harper had purchased pseudoephedrine at each of the stores. On March 12, 2009,

officers again watched as Harper and Stinson left the Airway Avenue residence in Harper's car and went to Albertsons, where they were observed in the pharmacy area; to Rite-Aid; to Wal-Mart; and then to a storage unit. It was confirmed that each of them had purchased pseudoephedrine and/or other methamphetamine components at each store. Detective Scrimsher surmised that as of March 13, 2009, Harper, Stinson, and Wolff had purchased a combined total of approximately 400 grams of pseudoephedrine that he was aware of which could be used to make "well over" one-half pound of methamphetamine and possibly more.

Based on this information in the affidavit, and giving the required deference to the magistrate's determination and drawing reasonable inferences in favor of the warrant's validity, we conclude that the requisite probable cause was established that Harper was involved in illegal drug activity and there was a fair probability that contraband or evidence of that activity would be found at the Airway Avenue residence.

## B.    Particularity

Harper also argues that the evidence seized should be suppressed because the search warrant did not contain a description of the place to be searched with sufficient particularity. Specifically, he argues that the search warrant was invalid because "[t]here is no question that [he] rented a room at the home searched and that the police were aware of this fact at the time they applied for the search warrant" and the warrant failed to identify his locked room as a separate sub-unit rented to him.

The Fourth Amendment safeguards the privacy of citizens by insuring against the search of premises where probable cause is lacking. *O'Keefe*, 143 Idaho at 285, 141 P.3d at 1154; *State v. Young*, 136 Idaho 711, 714, 39 P.3d 651, 654 (Ct. App. 2002). Accordingly, a search warrant must describe the place to be searched with particularity. *State v. Schaffer*, 112 Idaho 1024, 1027, 739 P.2d 323, 326 (1987); *O'Keefe*, 143 Idaho at 285, 141 P.3d at 1154. The purpose of the particularity requirement is to minimize the risk that officers executing search warrants will mistakenly search a place other than the one intended by the magistrate. *O'Keefe*, 143 Idaho at 285, 141 P.3d at 1154. Thus, the description must be sufficiently clear so that the property to be searched is recognizable from other neighboring properties. *Id.*; *Young*, 136 Idaho at 715, 39 P.3d at 655. The test for determining the sufficiency of the description of the place to be searched is whether the place is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort and whether there is any

reasonable probability that another premise might be mistakenly searched. *Young*, 136 Idaho at 715, 39 P.3d at 655.

The issue is further complicated if a building is a multi-unit residential structure as opposed to a single-family residence. The general rule is that a warrant issued for search of a multi-unit structure will be invalidated if it does not identify the sub-unit to be searched with sufficient particularity to preclude a search of other units in the same building occupied by innocent persons. *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987); *State v. Reynolds*, 148 Idaho 66, 69, 218 P.3d 795, 798 (Ct. App. 2009). However, an exception exists if officers did not know or should not have known that there are multiple, separate dwelling units. *Reynolds*, 148 Idaho at 69, 218 P.3d at 798.

In *Reynolds*, 148 Idaho 66, 218 P.3d 795, this Court applied the exception. There, the police had responded to a one-story house after receiving a call that a two-year-old child had died in the home from unknown causes. An officer specializing in drug investigation was called to the home, and he recognized the odor of growing marijuana plants coming from one of the two locked bedrooms on the main floor of the house. The officers questioned Reynolds, who stated that he lived in the room from which the marijuana smell was emanating and explained that a roommate lived across the hall from him and that a couple lived in the basement. All residents of the house had access to the common areas of the home, but each room in the house had keyed locks. There were no other indications that the rooms were separate rental units.

After Reynolds refused the officer's request to search his room, the officer applied for a search warrant. The affidavit in support of the request detailed evidence of methamphetamine use as well as the smell of growing marijuana plants and sought authorization to search the entire house for evidence of the suspected criminal activity. On appeal, Reynolds challenged the validity of the warrant, arguing that it did not specify the place to be searched with sufficient particularity because it failed to identify the separate sub-units that the police sought to search.

This Court upheld the district court's order denying Reynolds' motion to suppress, finding that the officer had no knowledge at the time he applied for the warrant that the house was anything other than a single-family residence with multiple occupants living within. We stated:

> The only external indication that there may have been subdivided units was the presence of locks on the doors--which the officer testified was not uncommon in single residences occupied by several people. Beyond the fact that there were

12

> locks on the doors, all the occupants shared common entrances and common areas, there was no evidence of separate utilities or mailboxes, and there were no individual markings on the doors. In short, there was very little, if anything, to create a belief that these were separate subunits. Therefore, the district court was justified in finding that the officer did not know, nor should have known, that the home was actually a multiunit structure. . . .

*Reynolds*, 148 Idaho at 71, 218 P.3d at 800.

In concluding that the warrant was not overbroad in the instant case, the district court discussed both *Garrison* and *Reynolds* and concluded that there was no evidence that the officer who applied for the search warrant had knowledge that the Airway Avenue residence was anything other than a single-family residence. On appeal, Harper contends that the district court's reliance on *Reynolds* was misplaced because it is factually distinguishable from the instant case. Unlike the situation in *Reynolds*, he contends that the officers in this case knew that Harper rented a room in the residence given his unequivocal statement to the officers at the time of the search. Thus, he contends the exception to the general *Garrison* rule that a unit need not be described with particularity if the officers did not know, or should not have known, that a residence was comprised of multiple units does not apply in this case. He also contends that *Reynolds* does not apply because its analysis was limited to the federal constitution and did not address Idaho's heightened constitutional protections and rejection of the good faith exception to the warrant requirement.

We need not determine whether the exception applied in *Reynolds* applies under our state constitution, however, because as we discuss below, a *Garrison* inquiry into what the officers knew, or should have known, regarding the living arrangements at the Airway Avenue residence was unnecessary.[3] A review of *Garrison* and its progeny reveals that these cases involve circumstances where the sub-unit alleged to not have been particularly described in the warrant was the residence of a person *not* described as a suspect in the warrant. The instant case is distinguishable--Harper himself was specifically named in the affidavit seeking the warrant as an active participant in the drug operation and as a resident of the Airway Avenue residence.

---

[3] We do note, however, that Harper's contention that officers knew at the time they applied for the search warrant that the home was a "multi-family dwelling and that Mr. Harper not only resided there but paid rent" is not supported by the record. Rather, the record indicates that, while they knew Harper resided there, the fact that he paid rent and had a lock on his bedroom door did not become apparent until the officers were in the midst of executing the warrant.

The Connecticut Supreme Court succinctly addressed this issue in *State v. Buddhu*, 825 A.2d 48 (Conn. 2003), and we consider its approach instructive. There, an informant told the police that the defendant (father) and his son were involved with the informant in a check forgery scheme, which included several meetings between the informant and the father at the father's residence. On this basis, law enforcement applied for a warrant to search the father's residence and to seize, among other things, bank account records, office equipment, and other items used in the manufacture of forged instruments. In the accompanying affidavit, the detectives stated that a search of the state department of motor vehicles records verified that both the father and son had listed their residential address as that identified by the informant, "958 Broad Street, Hartford." A warrant was issued, containing the following description of the place to be searched: "The residence of [the son] and [father], 958 Broad Street, Hartford, Ct. This is also the business location of PHOENIX CONSULTING SERVICES, operated by [the father]."

Law enforcement officers executed the warrant, and found that the building on Broad Street that bore the number "958" was a three-story, multi-unit dwelling, which had two unlabeled doors on each floor. Upon their arrival, officers ascended to the third floor of the building where they found two doors. They first knocked on the door on the left and then on the right. The son opened the door on the left and certain officers entered that unit and conducted a protective sweep. Officers asked the son where the father's room was located and the son told them that the father lived in the unit on the right. Officers instructed the son to open the door and the son complied, unlocking the door with a key. As a result of their search of the father's unit, officers seized several items that implicated the father in a forgery scheme.

The father filed a motion to suppress, arguing that the warrant did not describe with sufficient particularity the place to be searched because it did not particularly describe that he lived in a separate unit from the son. At the hearing on the motion, the detectives who applied for the warrant testified that they were aware that the building in which the son and father resided was a multi-unit dwelling and that the son and father resided on the third floor, but that due to an oversight, they failed to specify as much in their application for a warrant. However, the detectives also believed that the son and father resided at the same residence, even though it became apparent during execution of the warrant that they resided in different units. The *Buddhu* court held that the particularity requirement of the Fourth Amendment was satisfied.

14

The *Buddhu* court also noted that *Garrison* did not hold, implicitly or explicitly, that officers have a duty to disclose to the judge issuing the warrant that a residence is located in a multi-unit building--it merely held that if the police knew, or should have known, that the third floor of the multi-unit building contained additional residences for which there was *no probable cause to search*, the officers would have had a duty to exclude those residences from the warrant application. *Buddhu*, 825 A.2d at 61 (citing *Garrison*, 480 U.S. at 84-85). Thus, the *Buddhu* court surmised, *Garrison* only stands for the limited proposition that police officers have a duty to disclose material information that they discover or reasonably should discover and that reasonably would promote a narrow description of the place to be searched, so as to preclude indiscriminate searches of places for which there is *no probable cause to search. Id.*

The *Buddhu* court then held that, because the affidavit established independent probable cause to search both the son's and father's residences, a *Garrison* inquiry into what the officers knew, or should have known, about their living arrangements was unnecessary. *Id.* In other words, because police possessed probable cause to search both where the son resided and where the father resided, then omission to disclose to the issuing judge that they technically resided in separate residences would be irrelevant because there was no danger of authorizing a search of a residence for which there existed no probable cause.

We agree with the *Buddhu* court's interpretation that *Garrison* only requires that officers describe the particular residence to be searched if there are other units in a multi-unit building for which there is *not probable cause to search.* Idaho courts have consistently held that the purpose behind the particularity requirement is to minimize the risk that officers executing search warrants will mistakenly search a place *other than the one intended* by the magistrate, *O'Keefe*, 143 Idaho at 285, 141 P.3d at 1154, and, as we stated in *Reynolds*, "if officers know or should know that there are multiple, separate dwelling units, they must exclude from a requested warrant *those units that are not under suspicion.*" *Reynolds*, 148 Idaho at 69, 218 P.3d at 798. Implicit in this rule is that there is no requirement that units that *are* under suspicion be excluded. Thus, even assuming, without deciding,[4] that Harper occupied a separate residence within the

---

[4]    The general rule is that a locked bedroom door does not, in itself, automatically elevate a bedroom to the status of a separate residential unit. *See*, *e.g.*, *United States v. Kyles*, 40 F.3d 519, 524 (2d. Cir. 1994); *State v. Anderson*, 935 P.2d 1007, 1014 (Haw. 1997); *People v.*

15

Airway Avenue home, if the affidavit asserted probable cause to search his residence as well as Stinson's, the issue of whether officers identified the alleged multi-unit character of the residence to the issuing magistrate is irrelevant.

As we discussed above, Harper and Stinson were both named in the warrant and probable cause was established that both were involved in illegal drug activity and there was a fair probability that contraband or evidence of that activity would be found at the Airway Avenue residence--in either Harper's room or the rest of the residence. Thus, it was not necessary for the affidavit seeking the warrant to specifically describe Harper's "residence" because it need not have been excluded as there was no danger that it would be searched without probable cause. Here, the affidavit identified the residence by the street number, color, description, orientation, where the house number was located, and the vehicles typically located there. We conclude that this satisfied the particularity requirement.[5]

## III.

## CONCLUSION

Harper has failed to show that the district court erred in denying his motion to suppress because he has failed to demonstrate that the warrant was issued without probable cause and without the requisite particularity. Accordingly, we affirm his judgment of conviction for trafficking in amphetamine and/or methamphetamine by manufacturing and manufacture or delivery of a controlled substance where children are present.

Judge LANSING and Judge MELANSON **CONCUR.**

---

*Siegwarth*, 674 N.E.2d 508, 511 (Ill. App. Ct. 1996); *State v. Hymer*, 400 So. 2d 637, 638-39 (La. 1981).

[5] We need not address Harper's contention that the Idaho Constitution's heightened protection against unreasonable searches and seizures operates to invalidate the warrant in this instance. He bases this argument on the premise that the warrant was only valid based on application of the good faith doctrine which Idaho has rejected based on the Idaho Constitution. However, as we conclude above, validity of the warrant was based on probable cause and did not require application of the good faith exception to "save" it, and therefore application of the Idaho Constitution would not be dispositive.