# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 33229

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

ORA RAY CARSON,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

Boise, August 2011 Term

2011 Opinion No. 105

Filed: November 2, 2011

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Third Judicial District of the State of Idaho, in and for Canyon County. The Hon. Gregory M. Culet, District Judge.

The judgment of the district court is <u>affirmed</u>.

Jason Pintler, Deputy State Appellate Public Defender, Boise, argued for appellant.

Jessica M. Lorello, Deputy Attorney General, Boise, argued for respondent.

---

EISMANN, Justice.

Defendant was convicted of the murder of his three-month-old son and was sentenced to a fixed life sentence based upon the jury's finding that he exhibited utter disregard for human life. On appeal, he challenges the trial court's ruling barring alleged impeachment evidence of the child's mother, statements made by the prosecuting attorney during closing argument, and the jury instruction defining "utter disregard." We affirm the judgment of the district court.

## I.

### Factual Background

Veatrice Henson (Mother) and Ora Ray Carson (Defendant) had a son together (Baby) when they were engaged to be married. On September 15, 2004, at about 4:45 p.m., Mother left for work, leaving three-month-old Baby with Defendant. Mother checked into work at about 5:13 p.m.

At about 6:20 p.m., Defendant arrived at a hospital emergency room with Baby, claiming to have dropped him while giving him a bath. He stated that Baby hit his head on the side of the bathtub, and he immediately put Baby in the car and drove him to the hospital.

When the emergency room physician saw Baby, she knew he was verging on death. He was not crying, he was limp and did not respond to stimulus, he was bluish in color, and he had a large swelling area on the side of his head. Upon examination she observed that his pupils were fixed and dilated, he had no heartbeat, and he was not breathing or even making an effort to breathe. Baby was placed on a heart monitor at 6:21, which indicated there was still some electrical activity of the heart. The emergency room personnel immediately started cardiopulmonary resuscitation and intubated him, but to no avail. He was declared dead at 6:42 p.m. The emergency room physician testified that the massive brain injury that Baby sustained would have occurred within thirty minutes before he arrived at the hospital. On cross-examination, the physician stated that Baby was probably dead on impact.

An autopsy revealed that Baby suffered multiple blows to his head. He had a severe, Y-shaped, skull fracture on the right side of his head that was about six inches in its greatest dimension. He had a smaller skull fracture on the left side of his head, and bruises to his face. The injuries to his skull and brain were caused by very severe, blunt force trauma. In addition, he had a broken rib on his left chest. Because a baby's ribs are primarily flexible cartilage, they do not break easily. His injuries were not consistent with a fall.

The State charged Defendant with murder in the first degree and gave notice that it intended to seek the death penalty. The case was tried to a jury, and it returned a verdict finding Defendant guilty of first degree murder. There is no contention on appeal that the evidence is insufficient to support that verdict.

Because the State had given notice of the intent to seek the death penalty, the district court then conducted a special sentencing proceeding pursuant to Idaho Code section 19-2515(5). At the conclusion of the evidentiary portion of that hearing, the jury was first required to determine whether the State had proved a statutory aggravating circumstance beyond a reasonable doubt. I.C. § 19-2515(8)(a)(i). The court instructed the jury as to three aggravating circumstances. It was unable to reach a unanimous decision as to two of them,[1] but it

---

[1] The two statutory aggravating circumstances upon which the jury was unable to reach a unanimous decision were that "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," I.C. § 19-

2

unanimously found that "the State [has] proven beyond a reasonable doubt that by the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." The jury was then required to find "whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust." I.C. § 19-2515(8)(a)(ii). The jury found that imposition of the death penalty would be unjust. With that finding, Defendant was required to be sentenced to a term of imprisonment for life without the possibility of parole, I.C. § 19-2515(7)(b), and the court imposed that sentence. Defendant then timely appealed.

## II.

### Did the District Court Err in Excluding Extrinsic Evidence that
### Mother Had Been Unfaithful to Defendant?

Defendant was arrested on September 17, 2004, and he remained in jail throughout the proceedings below. Mother testified during the trial that she initially believed Defendant's version of what occurred. She stated that she terminated her relationship with Defendant in October 2005 because she "got sick of him starting to treat me like the rest of the men in my life did, calling me a whore and a slut, telling me that I was cheating on him." During her cross-examination, Defendant's counsel asked her if she was "cheating on" Defendant. She answered: "At the time, no, I was not. I did not start seeing somebody until after." Defendant's counsel then asked, "So in October of 2005, you had been totally faithful to [Defendant]?," to which Mother answered, "Yes."

Defendant testified in his behalf. He stated that he did not kill Baby, but Mother did. He said he protected her by not telling others that it was Mother who caused their son's death because she said it was an accident and he loved her. In May or June 2005, he became convinced that it was no accident and then began telling his attorneys what really happened.

Defendant's trial counsel informed the district court that he wanted to offer testimony from two men who would state that they had sexual relationships with Mother prior to October 2005. Counsel stated that the evidence was admissible under Idaho Rule of Evidence 404(b) to

---

2515(9)(e), and that "[t]he defendant, by his conduct, whether such conduct was before, during or after the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society," I. C. § 19-2515(9)(i).

show Mother's motive or intent for keeping the Defendant thinking that she loved only him and to impeach her under Rule 608(b). The district court ruled that the evidence was extrinsic evidence that is inadmissible under Rule 608(b), that it was irrelevant, and that under Rule 403 any relevance was "far outweighed by the prejudicial impact." Defendant's counsel later brought up the issue again, stating that there were three men who would testify that they had intimate relationships with Mother prior to October 2005. He argued that the evidence was admissible for impeachment, but it was primarily admissible under Rule 404(b) to show Mother's motive. He explained it as follows:

> [Mother's] position is, here is a man that just killed her son, and yet she continues to have a close relationship with him, continues to love him, write these loving letters, talk lovingly on the phone. Her motive is to continue to cover up.
> The fact that she was having a relationship with at least three other men indicates that, to her, the relationship was dead. But to [Defendant] she presented the relationship as continuing. She had a big stake in this that he continue to fall on the sword. That's her motive. The truth is a huge issue here.

The district court adhered to its prior decision.

Rule 608 of the Idaho Rules of Evidence provides that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation," but "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility, of the witness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." Idaho R. Evid. 608(a) & (b). Testimony from the men that they had sexual relationships with Mother is not admissible under Rule 608 to impeach her trial testimony that she had been faithful to Defendant. It was extrinsic evidence of specific instances of Mother's conduct for the purpose of attacking her credibility.

Defendant argues that the rule does not bar extrinsic evidence of specific instances of the conduct of a witness to show the witness's motive to lie. Rule 404(b) of the Idaho Rules of Evidence states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . . ." Idaho R. Evid. 404(b). However, evidence admissible under Rule 404(b) "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Idaho R. Evid. 403(b). In this case, the district court held that evidence of Mother's intimate relationships with others should

4

be excluded because it was irrelevant and any relevancy was substantially outweighed by the danger of unfair prejudice. "The trial court's I.R.E. 403 determination will not be disturbed on appeal unless it is shown to be an abuse of discretion." *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010).

In support of the admissibility of the evidence, Defendant's trial counsel argued that Mother "continue[d] to have a close relationship with [Defendant], continue[d] to love him, write these loving letters, talk lovingly on the phone." Her alleged motive for doing so was to keep him thinking that she loved him in the hope that he would not tell anyone that she was responsible for their baby's death. The argument is that from evidence showing that Mother was having sexual relationships with other men, the jury could infer that her motive for writing letters to Defendant saying she loved him was to keep him from telling anyone that she was responsible for Baby's death.

Assuming that Mother's motive was to falsely give Defendant the impression that she still loved him in the hope he would remain quiet, that impression undoubtedly evaporated when she terminated their relationship in October 2005, prior to the commencement of the trial in March 2006. In January 2006, Mother was brought to Idaho from California to talk with prosecutors regarding this case. At that time, she learned that Defendant was blaming her for their baby's death. She was also presented with evidence showing that his death was not accidental. She then, for the first time, talked with prosecutors. Thus, by January 2006 Defendant was no longer protecting Mother, but was asserting that it was she who killed Baby. If, prior to her terminating their relationship, Mother had falsely claimed to love him in the hope he would remain silent about what happened, that alleged ruse was no longer effective prior to the commencement of the trial.

"This Court freely reviews the question of relevancy as an issue of law." *Id*. Evidence seeking to show that for a while prior to trial Mother was telling Defendant she loved him when she was also having relationships with other men was simply not relevant. As the district court stated, "Whether or not she is sincere or not when she writes him the letters isn't the issue before this jury."

Defendant also contends that exclusion of the evidence violated his right to confront the witnesses against him. He argues, "The district court denied [Defendant] the ability to confront [Mother] with evidence showing that her expressions of love and claims of faithfulness were

false, and were made because she wanted him to continue to take the blame for [their baby's] death." Defendant initially claimed that he had accidentally dropped the baby while bathing him, but he has not pointed to any evidence that he did anything that would constitute *continuing* to take the blame for the baby's death, unless he means that failing to blame Mother was continuing to take the blame. Nevertheless, he has not provided any authority holding that the exclusion of irrelevant evidence violates a defendant's right to confront the witnesses against him. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (recognizing that during cross-examination a trial court can prevent interrogation that is only marginally relevant).

## III.

### Did the Prosecutor's Statement Regarding the Reasonable Doubt Instruction Deny Defendant Due Process of Law by Lowering the Standard of Proof for a Conviction?

The district court instructed the jury:

> Reasonable doubt is defined as follows: It is not mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is the state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

Defendant does not challenge the instruction given by the trial court. He admits that "the language of the instruction itself likely comports with the requirements of due process." He contends that unobjected-to comments by the prosecuting attorney during her closing argument, if followed by the jury, would have permitted it to convict Defendant upon proof that was less than beyond a reasonable doubt.

The district court instructed the jury on the meaning of reasonable doubt. Immediately following that instruction, it instructed the jury, "As members of the jury, it is your duty to decide what the facts are and to apply those facts *to the law that I have given you*." (Emphasis added.) After instructing the jury on the applicable law and the verdict form, the court stated, "*I have outlined for you the rules of law applicable to this case* and have told you of some of the matters which you may consider in weighing the evidence to determine the facts." (Emphasis added.) We presume that the jury followed the jury instructions given by the trial court in reaching its verdict, *Phillips v. Erhart*, 151 Idaho 100, ___, 254 P.3d 1, 10 (2011), and there is no indication that the jury did not follow the court's instructions.

6

## IV.

### Did the Prosecuting Attorney Commit Misconduct During Her Closing Argument by Appealing to the Jury's Passions or Prejudices?

Defendant contends that the prosecuting attorney committed misconduct during her closing argument by appealing to the jury's passions and prejudices. He characterizes the misconduct as follows:

> The prosecutor made multiple comments about [the baby's] small size and how precious he was, as well as stating that he was "alone and cold up in that cemetery" in a "little tiny grave" and told the jury "the important thing is remembering that this is about [the baby]. This is not about anything else, dirting (sic) on anybody or anything. This is about [the baby] and doing justice for him."

The Defendant did not object to these statements. "[W]here an error has occurred at trial and was not followed by a contemporaneous objection, such error shall only be reviewed where the defendant demonstrates to an appellate court that one of his unwaived constitutional rights was plainly violated." *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). Whether comments during closing arguments rise to the level of fundamental error is a question that must be analyzed in the context of the trial as a whole. *State v. Severson*, 147 Idaho 694, 720, 215 P.3d 414, 440 (2009). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The challenged comments, shown highlighted, in the context in which they occurred, are as follows:

> These [child homicide cases] are extremely hard. They affect all of us emotionally. But what we've got to focus on, is to use your skills that you've developed in your life reasoning things out, deciding who did this. **There is a little boy that's lying in a cemetery outside of Caldwell in a little tiny grave because somebody got angry and killed him.** This was no accident.
>
> The first part of this case, the first version of the truth, was what happened. Was it an accident, or was it intentional? And as time went by, it became real apparent, even to the defense expert, that this was no accident. This was abuse. This was murder.

It shifted then to, who did it?  That was in January of '06.  So as you listen to the evidence in this case, and as you think about who did this, and you use your reasoning skills, **focus on who's really important here, and that is [Baby].**

**[Baby] had his life stolen.  He will never ever ride a tricycle, he will never ever go to first grade, or go to his prom, or graduate from high school because somebody got angry and killed him.**

Parents are put on this earth to nurture and take care of their kids, not kill them.  There was a lot of dirt thrown on the mother, [Mother], in this case.  But I would invite you to think about when we're talking about, as a far as the dirt on [Mother].  Was there ever any dirt, except her own admission of prior drug use when she was younger, that happened before [Baby] was killed?

. . . .

Afterwards, she gets the story from Mr. Carson, somebody that she loved, somebody that took her to heights of happiness she had never had.  She grew up in a house that was a drug house.  She didn't have a mom that supported her.

She cuts on herself.  She's on anti-depressants.  This **little angel** here is what gave her every piece of happiness she had, and the man that had him with her was part of that (indicating).  She never ever wanted to believe that he would kill [Baby].  She never ever wanted to admit that to herself.

It's a very, very difficult thing, and she fell down.  She lost it, in more ways than just physically.  She went back to the old habit, the drug use.  She was homeless.  She lost her job.  She made a lot of bad decisions.  But just remember, this case is not about [Mother's] actions after the fact.  This is about [Mother's] actions on the day [Baby] died.

. . . .

And, yeah, they did -- at least Detective Ballard did -- confront him [Defendant].  It was accusatory.  It was an interrogation.  And she chose to use a shock method to try to get to the truth.  "What really happened to [Baby]?"  Tell me, tell me, tell me, tell me, tell me.  Over and over again.  Okay.  It's not matching the physical evidence, let's try the shock treatment.

She gets the book of [autopsy] photos out, only some of which you saw.  And when you, not even knowing this **precious little angel**, saw those photos, what was the reaction?  What do normal people have as a reaction?  Do they sit there and think, that's my baby, scream out, cover their face?

A few seconds tick by, they start looking at the photos, close, right there on the table in front of him.  Looking at the photos.  And the Detective's saying, look, there's one skull fracture.  There's another skull fracture.  Didn't happen the way you said it did.  For a long time that book's open there, and you see if you see a tear in that interview.

8

I mean, even if you were an animal lover, taking this clearly apart from being a parent, could you even look at pictures like that of your favorite pet if they had to do that? I mean, let alone the most precious thing to your soul, your child. Unimaginable. Strangers that don't even know that baby have a hard time looking at those pictures.

. . . .

Yeah**. [Baby] is up in a cemetery, and [Mother] hasn't bought him a nice big headstone;** she is dirt poor. She doesn't even have a house. Yet, that's what she heard on the witness stand. He's in an unmarked grave. No, he's got his name on the grave, he just doesn't have a big stone, because I can't afford it. They want $5,000.

Nobody else has made any efforts either. What about Mr. Carson? **There is no stone for [Baby]. But there is hope. There is hope that justice will be done in this case.** That's the job we have in this courtroom today, is to do justice and not be fooled by all these other things that are meant to distract, meant to anger you and get you emotionally upset with [Mother].

. . . .

Most of the time First Degree Murder says, premeditated. Lay and wait, plan it out. That's not how this is. This law is written so if you lose it, and you beat that baby, and you kill that baby, and you know what you're doing when you do it, it's no accident, you'll suffer the consequences. It's First Degree Murder.

And Mr. Carson, the one that was with this baby 30 minutes before he came to the hospital, beat this child to death. That **little child is laying in the grave in Caldwell with no big marker on him, but dearly loved by a mother who's visited him multiple times since she's been here.** It's because Mr. Carson lost it. He lost his temper. That child lost everything.

. . . .

If you don't think that express malice applies, there's also malice implied. And that's when you look at everything again. It reads, "Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life. The act was deliberately performed with knowledge of the danger to and with conscious disregard for human life."

**Those tiny little fingers. Those little bitty fingers that you're so careful to pull through the arms of their garments when you're dressing them. Their little nighties or their sweaters.** You know how tender babies are, that's why we hold them so tight, so we don't drop them. That's why [Mother] put the pillow under him on the sofa, so if he rolled off, he had a pillow there.

**They are the most precious little tiny things.** And when you take them and slam them against something, or strike them multiple times, whether it's with a PlayStation handle, or on the table, or with your fist, blunt force trauma, that's

9

disregard for human life [referring to the jury instruction defining implied malice].

In context, the prosecuting attorney's comments were not attempts to have the jury decide the case based upon emotion rather than upon the law as set forth in the jury instructions and the evidence admitted during the trial. The reference to Mother not being able to purchase a headstone for Baby's grave was brought out by defense counsel during his cross-examination. In an apparent attempt to show that the lack of a headstone indicated that Mother did not really love Baby, and could have therefore killed him, defense counsel questioned Mother as follows:

> Q. Okay. A couple of questions I forgot. You indicated that you loved [Baby] deeply; correct?
> A. Yes, I did.
> Q. And you said that you visited him every Sunday at the grave site; is that correct?
> A. Yes, it is.
> Q. I have been there. I visited his grave site. And it is unmarked. Would you disagree that, there is no headstone?
> A. There is a marker on his headstone.
> Q. That comes from the County, doesn't it?
> A. Yes. With me being unemployed and being at rock bottom, I really can't afford to buy my son a headstone.
> Q. I know that. I know that. So you didn't have the finances and the wherewithal? You had no money whatsoever to put a headstone up for [Baby]?
> A. No, I don't.
> Q. You didn't at any time during 2005?
> A. No. They want almost $5,000 for a headstone, for my son's headstone.
> Q. The one you want to get him?
> A. Yes.
> Q. Okay.
> A. I have made arrangements for it. And I have –
> Q. I want to ask you some general question about [Defendant] as a father and also about you as a mother.

Prior to closing arguments, the district court instructed the jury:

> As members of the jury, it is your duty to decide what the facts are and to apply those facts to the law that I have given you. You are to decide the facts from all the evidence presented in the case.
> The evidence you are to consider consists of:
> 1. sworn testimony of witnesses;
> 2. exhibits which have been admitted into evidence;
> 3. any facts to which the parties have stipulated.
> Certain things you have heard or seen are not evidence, including:

l. arguments and statements by lawyers. The lawyers are not witnesses. What they say in their opening statements, closing arguments, and at other times is included to help you interpret the evidence, but is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, follow your memory.

. . . .

"The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *United States v. Young*, 470 U.S. 1, 7 (1985). Considering the prosecutor's challenged comments in the context in which they occurred and the court's instructions to the jury, there is no indication that the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Defendant also contends that during closing argument the prosecutor vouched for Mother's credibility by making the following statement, highlighted in context:

If she was cold blooded enough, number one, to beat a baby to death, multiple blows—and that skull fracture took a tremendous amount of force and violence—and somebody cold blooded enough to let somebody else take the fall, **why didn't she just disappear?**

**But she's here.** Does that make sense? She's here to support [Baby]. She testified about what happened that day. She told you that she was home with [Baby] during the day, and that he had a little bit of a fever, was sleeping on the couch. She changed him, she took his temperature, he got the Tylenol, she got ready for work.

Idaho Rule of Professional Conduct 3.4 provides, "A lawyer shall not . . . in trial . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused." The rule applies to both the prosecuting attorney and to defense counsel. With respect to due process, however, the Supreme Court has explained why the prosecutor cannot vouch for a witness's credibility or express a personal opinion of the defendant's guilt.

The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985).

11

Defendant's trial counsel did not object to the challenged comments. By the challenged comments, the prosecutor was not expressing a personal opinion regarding the credibility of Mother. Defendant had testified that Mother killed Baby. The prosecutor was merely arguing that Mother's conduct, as shown by the evidence, was inconsistent with that allegation. The prosecutor and defense counsel are free to argue the evidence and the reasonable inferences that can be drawn from that evidence, even if the evidence argued indicates that a witness is or is not truthful.

Finally, Defendant contends that the prosecuting attorney committed misconduct in an attempt to explain the concept of reasonable doubt to the jury. Again, there was no objection to the argument. As explained above, the trial court instructed the jury on the meaning of reasonable doubt and instructed the jury to follow the law as given by the court. We need not address the prosecutor's explanation of reasonable doubt because, even if it was incorrect, we presume the jury followed the court's instructions.

## V.

### Should the Jury's Finding that Defendant Exhibited Utter Disregard for Human Life Be Set Aside Because Either the Jury was Improperly Instructed or There Was Insufficient Evidence to Support that Finding?

Under Idaho law, a person cannot be sentenced to death unless the trier of fact finds beyond a reasonable doubt at least one statutory aggravating circumstance. I.C. § 19-2515(3). One of such circumstances is that "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." I.C. §19-2515(9)(f). The jury found that circumstance to exist in this case. As a result of that finding and the jury's finding that imposition of the death sentence would be unjust, Defendant was sentenced to a mandatory sentence of life imprisonment without the possibility of parole. Defendant contends that the jury was improperly instructed regarding utter disregard and that the evidence did not support that finding.

The first issue we will address is the meaning of that aggravating circumstance. In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), we stated that "a reasonable person could fairly characterize any murder . . . as exhibiting an 'utter disregard for human life.' " *Id*. at 418, 631 P.2d at 200. Therefore, in *Osborn*, we limited the scope of the phrase to mean "acts or

12

circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Id*. at 419, 631 P.2d at 201.

That limiting construction was later challenged before the United States Supreme Court in *Arave v. Creech*, 507 U.S. 463 (1993). The Supreme Court identified the issue to be decided as "whether the 'utter disregard' circumstance, as interpreted by the Idaho Supreme Court, adequately channels sentencing discretion as required by the Eighth and Fourteenth Amendments." *Id*. at 465. The Court held, "The Idaho Supreme Court has adopted a limiting construction, and we believe that construction meets constitutional requirements." *Id*. at 471.

When addressing this Court's limiting construction, the Supreme Court stated, "In ordinary usage, then, the phrase 'cold-blooded, pitiless slayer' refers to a killer who kills without feeling or sympathy." *Id*. at 472. Defendant contends that the definition approved by the Supreme Court in *Arave* is insufficient in this case because in that case a judge construed the wording when imposing sentence while in this case a jury did. That is a distinction without a difference.

In *Osborn*, we defined the phrase "utter disregard for human life" as being synonymous with "the cold-blooded, pitiless slayer." The Supreme Court in *Arave* held that the ordinary meaning of that phrase was "a killer who kills without feeling or sympathy." *Id*. It then stated, "We assume that legislators use words in their ordinary, everyday senses, and there is no reason to suppose that judges do otherwise." *Id.* (citation omitted). The ordinary meaning of the words does not change depending upon whether they are being utilized by a judge or a jury.

In this case, the district court did not merely assume that the jury knew the ordinary meaning of the words, but defined it for them. The district court instructed the jury as follows:

> "Exhibited utter disregard for human life with regard to the murder or the circumstances surrounding its commission" refers to acts or circumstances surrounding the crime that exhibit the highest, the utmost callous disregard for human life; i.e., the cold-blooded pitiless slayer.
>
> "Cold-blooded" means marked by absence of warm feeling, without consideration, compunction, or clemency, matter of fact, or emotionless.
>
> "Pitiless" means devoid of or unmoved by mercy or compassion. A cold-blooded pitiless slayer refers to a slayer who kills without feeling or sympathy.
>
> The "utter disregard" factor refers to the defendant's lack of conscience regarding killing another human being.

13

Defendant does not contend that the definition given by the court in any way conflicts with the limiting construction we gave in *Osborn*.

Defendant argues that the Supreme Court in *Arave* recognized that the words "cold-blooded, pitiless slayer" cannot include the murderer "who kills because of some emotional response." The *Arave* Court stated:

> A sentencing judge might conclude that every first-degree murderer is "pitiless," because it is difficult to imagine how a person with any mercy or compassion could kill another human being without justification. Given the statutory scheme, however, we believe that a sentencing judge reasonably could find that not all Idaho capital defendants are "coldblooded." That is because some within the broad class of first-degree murderers do exhibit feeling. Some, for example, kill with anger, jealousy, revenge, or a variety of other emotions.

*Id*. at 475-76. Defendant asserts that the jury instruction given in this case was defective because it did not "eliminate the slayer whose actions are compelled by some emotional response."

In *Osborn*, we defined someone who kills with utter disregard for human life as being the "the cold-blooded, pitiless slayer." 102 Idaho at 419, 631 P.2d at 201. The jury instruction used those exact words.

The *Arave* Court stated that "cold-blooded" means "marked by absence of warm feelings: without consideration, compunction, or clemency" and "matter of fact, emotionless." 507 U.S. at 472. The jury instruction defined it as "marked by absence of warm feeling, without consideration, compunction, or clemency, matter of fact, or emotionless."

The *Arave* Court said that "pitiless" means "devoid of, or unmoved by, mercy or compassion." *Id*. at 471. The jury instruction defined "pitiless" as "devoid of or unmoved by mercy or compassion. A cold-blooded pitiless slayer refers to a slayer who kills without feeling or sympathy."

The jury instruction adequately distinguished between the cold-blooded, pitiless slayer and those who kill with with anger, jealousy, revenge, or a variety of other emotions. Defendant did not object to the instruction at the trial. Therefore, he must show that the instruction constituted fundamental error because it violated one or more of his unwaived constitutional rights. *State v. Perry*, 150 Idaho 209, 226, 245 P.2d 961, 978 (2010). The issue in *Arave* was whether the definition of the phrase "utter disregard for human life," as narrowed by our opinion in *Osborn*, met the Supreme Court's requirements for the imposition of the death penalty. In this

14

case, Defendant was not sentenced to death. Therefore, the issue here is whether the instruction given by the district court was an accurate statement of the statutory aggravating circumstance. It was. Therefore, Defendant has failed to show fundamental error.

Defendant asserts that the instruction given by the district court was erroneous because it "allows the jury to judge the surrounding circumstances in determining whether [Defendant] exhibited 'utter disregard.' As such, the instruction does not accurately state the law." The statute states, "By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." I.C. § 19-2515(9)(f). It permits the jury to consider the surrounding circumstances. As the Supreme Court stated in *Arave*: "The terms 'cold-blooded' and 'pitiless' describe the defendant's state of mind: not his *mens rea*, but his attitude toward his conduct and his victim. The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a **fact** to be inferred from the surrounding circumstances." 507 U.S. at 473. (Emphasis in original).

Defendant also contends that the instruction is confusing because it "pars[es] this lexicon of death." In essence, Defendant contends that the court gave the jury too detailed of an explanation of "utter disregard for human life," but he does not present any logical argument that the jury would not have understood the meaning of those words.

Finally, Defendant asserts that there was insufficient evidence to show that he exhibited utter disregard for human life when he killed Baby. He states, "The evidence presented and the arguments made by the State show that, assuming [Defendant] killed A. H., his actions were a result of an emotional, rather than a cold-blooded, reaction." The arguments made by the prosecutor during the trial are not evidence. Although Defendant testified, he did not explain the circumstances surrounding his murder of Baby. He did not testify that he killed with anger, jealousy, revenge, or some other emotion. The only evidence he points to is that he took Baby to the emergency room shortly after inflicting the fatal blow.

Defendant beat a helpless, three-month-old baby to death with multiple blows. The nurse who took Baby from Defendant after he arrived at the emergency room described him as acting "[i]n a casual manner. I didn't see anything urgent about his demeanor or his need to get my assistance." The nurse who was the manager of the emergency room testified that when she saw Defendant, he initially seemed "scared," and then when she later told him that Baby was not doing well he became angry. A sergeant with the sheriff's department arrived at the hospital at

15

about 7:00 p.m. that night. She testified that Defendant "wasn't displaying any emotion. He was acting normal. He would laugh at times. He acted maybe just a little shaken up." The Sergeant described Mother's demeanor as "crying, was very upset, at times, thought she was going to be sick. She was very upset." The jury could reasonably have concluded that it was not out of concern for Baby that Defendant took him to the hospital, but Defendant did so in an attempt to avoid the consequences of his own conduct, knowing that he had better act like it was an accident.

We will not overturn a jury's finding if there is evidence upon which a reasonable trier of fact could have found the essential elements beyond a reasonable doubt. *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007). "We view the evidence in the light most favorable to the prosecution, and we do not substitute our judgment for that of the jury regarding the credibility of the witnesses, the weight of the evidence, and the reasonable inferences to be drawn from the evidence." *Id.* There was sufficient evidence to support the jury's finding that by the murder, or the circumstances surrounding its commission, Defendant exhibited utter disregard for human life.

## VI.

### Conclusion

We affirm the conviction and the sentence.


Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**