**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 44300**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2018 Opinion No. 2 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: January 11, 2018 |
| | ) | |
| v. | ) | Karel A. Lehrman, Clerk |
| | ) | |
| KENT GLEN WILLIAMS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Steven J. Hippler, District Judge.

Judgment of conviction for two counts of robbery, with a deadly weapon enhancement, and unlawful possession of a firearm, <u>affirmed</u>.

Kent Glen Williams, Boise, pro se appellant.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

A jury found Kent Glen Williams guilty of two counts of bank robbery, one count of use of a firearm in the commission of a robbery, and one count of unlawful possession of a firearm. On appeal, Williams raises six issues: (1) that the district court abused its discretion by denying Williams' motion to sever the two robbery charges; (2) that the prosecutor committed misconduct in closing argument amounting to fundamental error; (3) that the district court deprived Williams of his state constitutional right to hybrid representation; (4) that the district court deprived Williams of his Fifth and Fourteenth Amendment rights to a fair trial and to be free from excessive restraints during pretrial proceedings; (5) that the district court deprived Williams of his Sixth Amendment right to self-representation; and (6) that the district court erred

1

in denying Williams' motions to suppress the evidence obtained from Williams' detention and from his hotel room.[1] For the reasons provided below, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2012, a Caucasian male wearing a maroon shirt, white baseball cap, and large mirrored aviator sunglasses entered a bank in Boise, minutes after opening. The man handed the teller a note demanding money, and the man indicated that he had a gun and would shoot. The teller described the robber, who did not have a mask, as having an upturned nose. The suspect fled the bank after receiving the money.

In April 2015, a 5-foot-8-inch to 6-foot Caucasian male wearing mirrored aviator sunglasses approached a teller at another branch of the same bank, shortly after opening, and demanded cash bills consisting of twenty, fifty, and one hundred dollar bills. The man wore a long-sleeved maroon windbreaker jacket, a maroon handkerchief-type mask that he snapped over his mouth and nose, and a black baseball-style hat covering his ears. He explicitly told the teller to retrieve money from two specific tills, and the man did not want any die packs or "bait." At no time did he display a firearm or threaten to use a firearm. After receiving the money, he left on foot. Contrary to the robber's demand, the teller provided the man with bait money and one bill affixed with a tracking device.

The tracking device sent out a tone alert to law enforcement, leading officers to an intersection where the bill, affixed with the tracking device, lay in the middle of the street. Officers then contacted a nearby HVAC business which had outside video cameras recording the street where the bill was located. The HVAC video contained footage of a Caucasian man in a green compact sedan with a lime-green bumper sticker centered on the trunk. The driver, who appeared to have no facial hair and closely cropped hair, dropped something out of the driver's side window. The driver's jacket and bandana matched the description of the April 2015 robber. The investigating officer determined the vehicle was a 1997 or 1998 Chevy Malibu with customized wheels and out-of-state plates. Additionally, the investigating officer also noticed, after reviewing internal surveillance videos from the bank, a small, yet visible, raised bump the

---

[1]     This Court granted Williams' motion to withdraw his claim that the district court abused its discretion by denying Williams' motion for substitution of counsel.

2

size of a pencil eraser on the back side of the robber's left hand, located between the third finger and the wrist.

In July 2015, a Caucasian male, between 5 foot 8 inches and 6 foot, entered the same bank, just after opening, as that in the 2012 robbery. The man wore a yellow long-sleeved jacket, a yellow handkerchief mask, a dark-billed hat, and mirrored aviator sunglasses. He demanded twenty, fifty, and one hundred dollar bills from two particular drawers and specifically asked for no trackers or die packs. As the teller pulled money from the drawers, the robber noticed a tracking device on one of the twenty dollar bills. After the man grabbed the bill and felt the tracking device inside, he lifted his shirt and pointed to a gun in his waistband.

After investigation, which included the internal surveillance videos from the banks, the investigating officer suspected, due to noteworthy similarities, that the same individual committed all three robberies. Based on the HVAC video footage from the April 2015 robbery and still shots of the suspect from the banks' video footage during the three robberies, the investigating officer issued a bulletin to news and local police departments requesting any information on the suspect. That same day, a detective notified the investigating officer that a vehicle matching that described in the bulletin was parked at a nearby hotel. The detective took and sent pictures of the vehicle to confirm. The investigating officer requested that the detective, who was in plain clothes and an unmarked car, remain with the vehicle. The vehicle was a green, 1999 Chevy Malibu with wheels consistent with the images from the April 2015 HVAC footage. On the trunk there was a section of a bumper sticker which matched the same shape and size of the bumper sticker from the April 2015 footage. In addition, there was an adhesive residue with a greenish tint which was also consistent with the lime-green bumper sticker location seen in the April HVAC 2015 footage. The license plate also matched the April 2015 footage; a white and blue out-of-state license plate. Additionally, the rims on the wheels matched those depicted in the April 2015 HVAC photographs. Another detective confirmed with the hotel's manager that according to the hotel's records, the vehicle was registered in Williams' name and that Williams had been residing at the hotel in the same room for two weeks. Hotel staff also confirmed that Williams was the only occupant of the room.

The vehicle's license number was run through the Washington Bureau of Licensing. The report confirmed Williams was the sole registered owner and had been since prior to the April 2015 robbery. The investigating officer also confirmed Williams' date of birth, height, and

Washington address. Williams' DMV photograph, received by the investigating officer, revealed an upturned nose and closely cropped hair, consistent with the photograph and description of the suspect from the 2012 robbery. Moreover, another detective indicated that he believed, after observing Williams entering and leaving the room registered to Williams, that Williams was the same individual on the bulletin.

In order to determine whether Williams had an identifying bump on the back of his left hand, matching that of the suspected robber, an officer dressed as a tow truck operator stood near a tow truck as it backed up to Williams' sedan. Williams exited his room and approached the tow truck. When the officer showed Williams his badge, Williams turned away and refused to speak.

Law enforcement then placed Williams in handcuffs. The investigating officer confirmed that Williams' nose was similar to the description given by the witness in the 2012 robbery. Then, the investigating officer rolled Williams' left hand to the side and observed a visible bump, consistent with the one seen in the bank surveillance video. The investigating officer, believing that Williams was very likely the suspect wanted for the robberies, had a patrol car dispatched to the scene, and law enforcement placed Williams inside. The investigating officer testified that at this point he placed Williams under arrest.

After peering through Williams' hotel room window and noticing two backpacks, the investigating officer applied for a search warrant for the vehicle and hotel room. In his affidavit, the investigating officer set out his investigation, including a description of the similarities between the three robberies and his corroborations regarding the vehicle; Williams' unique nose; and the similar bump on his left hand. Additionally, the investigating officer noted he had eighteen years of experience as a police officer in Idaho, serving as a detective for the violent crimes robbery unit for the last eight of those years. He also included photos from his investigation, including still shots from each of the three bank robberies; photos of the vehicle (both from the HVAC video and from the hotel parking lot); and Williams' DMV photo. A search warrant was issued for Williams' hotel room and the vehicle.

During the search of a backpack inside the hotel room, the investigating officer found a green lightweight coat with a green piece of sewn triangular cloth, sewing needles, a handgun, and magazines. Inside the vehicle, the investigating officer found a blue and green coat with a

4

blue and green acid washed cloth and several large mirrored "aviator" sunglasses in the jacket's center pocket.

Police also found nearly $7,000, with some of the bills bearing sequential serial numbers. Williams was indicted for one count of robbery and one count of a felon in possession of a firearm. Williams pled not guilty. Four months later, the State indicted Williams for an additional count of robbery with a firearm enhancement.

Prior to trial, Williams made several motions, including a motion to sever the two robbery charges and two motions to suppress evidence. Williams also requested (1) to be released from the "black box handcuffs" during his pretrial proceedings; (2) to have substitute counsel because he was dissatisfied with his counsel's tactical decisions; (3) to have trial counsel perform voir dire, while Williams conducted the remainder of the trial pro se; and (4) to be free of restraints while representing himself during trial. The district court, after conducting hearings, denied Williams' motions. The district court determined that due to safety concerns Williams would wear the black box during pretrial proceedings. Further, the court instructed Williams he could either represent himself or have counsel, not both. Additionally, after being instructed that he would wear a leg tether during trial, Williams withdrew his request to self-represent.

A jury found Williams guilty of two counts of robbery, one count of a firearm enhancement, and one count of a felon in possession of a firearm. The district court entered a judgment of conviction. Williams timely appeals.

## II.

## ANALYSIS

### A.      Motion to Sever

Williams first argues the district court erred in denying his motion to sever the two robbery charges. Williams argues the evidence of the two separate robbery charges would be inadmissible character evidence and that neither demonstrated a common plan, scheme, or identity. Alternatively, Williams argues that even if the evidence was admissible, the charges should have been severed because the probative value of the evidence of each offense was substantially outweighed by the prejudicial effect. The State argues the evidence revealed a common plan or scheme. Further, the State argues the evidence of each separate robbery was admissible to show identity.

5

We review a district court's denial of a motion to sever under an abuse of discretion standard. *State v. Orellana-Castro*, 158 Idaho 757, 760, 351 P.3d 1215, 1218 (2015); *State v. Eguilior*, 137 Idaho 903, 907, 55 P.3d 896, 900 (Ct. App. 2002). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court correctly perceived the issue as one of discretion, acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it, and reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

In determining whether to grant or deny a motion to sever, the antecedent issue for the district court is whether joinder was permissible under Idaho Criminal Rule 8. *Orellana-Castro*, 158 Idaho at 760, 351 P.3d at 1218. Joinder of offenses is permissible "if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." I.C.R. 8(a).

If such commonality requirement is met, the defendant may still obtain relief pursuant to I.C.R. 14 by showing that joinder would result in unfair prejudice. *State v. Wilske*, 158 Idaho 643, 644-45, 350 P.3d 344, 345-46 (Ct. App. 2015). Idaho Criminal Rule 14 provides that upon the showing of unfair prejudice, the court "may order the state to elect between counts, grant separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires."

There are three potential sources of prejudice for a court to consider when considering a motion to sever based on I.C.R. 14:

> (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep evidence properly segregated; (2) the defendant may be confounded in presenting defenses, as where he desires to assert his privilege against self-incrimination with respect to one crime but not to the other; or (3) the jury may conclude that the defendant is guilty of one crime and then find him guilty of the other because of his criminal disposition.

*State v. Abel*, 104 Idaho 865, 867-68, 664 P.2d 772, 774-75 (1983). On appeal, Williams focuses on the third potential prejudice; where the jury could find guilt based on a perceived criminal disposition. Thus, Williams argues, the robbery charges should have been severed because

6

evidence pertaining to one robbery led the jury to find him guilty of the other robbery based solely on a perceived disposition of criminal activity.

In considering whether to grant a motion to sever based on the third potential prejudice, the court must first determine whether the evidence of the multiple alleged offenses could have been admitted in the different trials had the counts been tried separately. *Id.* at 868, 664 P.2d at 775. If the answer is yes, there is no prejudice and a court may properly deny the motion. *Id.* In such a circumstance, "the analysis is the same as to whether the offenses are part of a common scheme or plan permitting joinder under Criminal Rule 8(a) and whether the defendant would be prejudiced by joinder because the offenses were not part of a common scheme or plan under Evidence Rule 404(b)." *Orellana-Castro*, 158 Idaho at 760, 351 P.3d at 1218. As stated in *Orellana-Castro*, "The events must be linked by common characteristics that go beyond merely showing a criminal propensity and instead must objectively tend to establish that the same person committed all the acts." *Id.* at 762, 351 P.3d at 1220 (quoting *State v. Johnson*, 148 Idaho 664, 668, 227 P.3d 918, 922 (2010)).

In this case, the district court found that the evidence was sufficient to show a common scheme or plan because: (a) the April 2015 and July 2015 robberies were relatively close in time; (b) both locations were local branches of the same bank; (c) the robberies occurred shortly after opening; (d) the perpetrator in each was a Caucasian male between 5 foot 8 inches and 6 foot, or just over 6 foot; (e) he was described as having a similar general appearance; (f) in both, he wore a dark-billed cap with a long-sleeved jacket; (g) in both, he pulled a handkerchief up over his mouth and nose upon entering the bank; (h) the jacket and handkerchief in both robberies were "color-coordinated;" (i) he wore similar mirrored aviator sunglasses in each robbery; (j) he appeared to have knowledge of this particular bank's layout; (k) he demanded cash from two particular drawers, which were hidden from customer view; (l) in both he asked specifically for denominations of twenty, fifty and one hundred dollar bills; (m) he explicitly asked the tellers in each not to include any dye, bait, or trackers; and (n) he quickly found the electronic tracker hidden inside a bill in each case.

In addition, surveillance of the area surrounding the April 2015 robbery identified a particular car that the tracker bill was thrown from, including the car's color, make, model, and year. Williams' car matched this description. The cars also had similar wheels and Williams' car had a marking that indicated there was a green sticker on the trunk, in the same location as

7

the sticker on the car identified in the April 2015 robbery. The person in the car was a Caucasian male with closely cropped hair, as was Williams. Williams also had a bump on his hand that matched that of the robber's hand as seen in surveillance in the April 2015 robbery.

The search warrant also yielded two long-sleeved shirts with color-coordinated handkerchiefs with a custom sewn elastic band in the back of the handkerchiefs, as well as the sewing material necessary for such a custom sew job. A similar gun displayed in the July robbery was found, as well as thousands of dollars in hundred dollar bills, some of which were sequential. Several pairs of mirrored aviator glasses were also found.

Taken by itself, this evidence may not be distinctive or common; however, when the similarities are considered in their totality, it goes beyond mere coincidence. Accordingly, the district court did not abuse its discretion in determining there was sufficient evidence to show a common scheme or plan.

The district court determined as well, that this same evidence supported a determination that evidence of one robbery was admissible under Idaho Rules of Evidence 404(b). Rule 404(b) "precludes evidence of other crimes, wrongs or acts . . . to prove the character of a person in order to show that the person acted in conformity therewith." However, evidence is not precluded by I.R.E. 404(b) to "prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Other crime evidence may be admitted if the evidence of the other crimes is so distinctive that it can be seen as a "signature" identifying a unique defendant. *See Johnson*, 148 Idaho at 668, 227 P.3d at 922. Thus, the question for the court then is whether the events are linked by common characteristics that go beyond merely showing a criminal propensity but instead objectively tend to establish that the same person committed all the acts. *Id.*; *State v. Grist*, 147 Idaho 49, 54-55, 205 P.3d 1185, 1190-91 (2009).

In support of determining that the evidence was admissible to prove identity, the district court found the above-mentioned similarities between the April 2015 and July 2015 robberies. Markedly, the district court found the fact that each robbery was at a branch of the same bank, the comparable timing of the robberies, the identical demands for money, the similarities of the disguises used, the physical appearances of the men, and the matching markings on the hands all supported admitting the evidence to prove identity.

Further, evidence obtained by police supported the district court's determination that the evidence would be admissible in separate trials to prove identity. This included evidence obtained by execution of warrants that the car used in the April 2015 robbery was registered in Williams' name prior to the April 2015 robbery; that the left hands of the robber in April 2015 and Williams had similar bumps; that police found "two other sets of color matching long-sleeved shirt and handkerchief" in Williams' possession; that the handkerchiefs had an "elastic band custom sewn into the back"; that Williams had sewing materials consistent with having sewn in the elastic mask holders; that Williams had a handgun "consistent with the one that was . . . displayed in the July bank robbery"; that police found "approximately $7,000" in hundred dollar bills, some of which had sequential serial numbers; and that Williams had "several pairs of mirrored aviator sunglasses matching the description [of glasses] used in both robberies." Again, while any one of the common facts might be coincidental or common to the crime of bank robbery, taken together the facts make a compelling case that the same person committed each robbery. Moreover, the majority of the evidence found upon execution of the search warrants was relevant to both of the robberies. Therefore, the district court did not err in concluding that the evidence was admissible to prove identity. Because evidence of one robbery was admissible at trial for the other robbery, there would be little prejudicial effect. Accordingly, the district court did not abuse its discretion in denying Williams' motion to sever.

## B. Prosecutorial Misconduct

Williams next argues the prosecution committed misconduct amounting to fundamental error based on four aspects of the State's closing argument. The first is the prosecutor's statement regarding the defense's version, in opening and closing argument, that officers attempted to "pin" the robberies on Williams. Williams argues the prosecutor impermissibly disparaged defense counsel by labeling these opening and closing remarks as ludicrous allegations. Second, Williams contends the prosecution improperly interjected his personal beliefs by informing the jury he was personally offended by defense counsel's actions, as well as being offended on behalf of law enforcement for the same. Third, Williams argues the prosecutor impermissibly vouched for the police officer's credibility. Finally, Williams contends the prosecutor's statements that this was an example of "good work," "a fine job," and "good police work," which allowed them to solve the case, impermissibly vouched for the police and placed the State's prestige behind them. Williams argues that either alone or collectively, these

9

statements were enough to prejudice Williams and thus deprived him of his unwaived constitutional right to a fair trial.

The State first argues that none of the statements amounted to misconduct. The State further argues that the prosecutor's comments did not violate an unwaived constitutional right. Finally, the State argues that alternatively, if there was a constitutional violation, Williams suffered no prejudice.

While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, the prosecutor is nevertheless expected and required to be fair. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). However, in reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.*

Williams made no contemporaneous objection to the prosecutor's closing argument at trial. In *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), the Idaho Supreme Court clarified the fundamental error doctrine as it applies to allegations of prosecutorial misconduct. If the alleged misconduct was not followed by a contemporaneous objection, an appellate court should reverse when the defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Id.* at 226, 245 P.3d at 978.

Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Its purpose is to enlighten the jury and to help the jurors remember and interpret the evidence. *Id.*; *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002, 1007 (Ct. App. 1991). Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003); *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

Generally, closing argument should not include counsel's personal opinions and beliefs about the credibility of a witness or the guilt or innocence of the accused. *Phillips*, 144 Idaho at 86, 156 P.3d at 587; *see also State v. Garcia*, 100 Idaho 108, 110-11, 594 P.2d 146, 148-49 (1979); *State v. Priest*, 128 Idaho 6, 14, 909 P.2d 624, 632 (Ct. App. 1995); *State v. Ames*, 109

10

Idaho 373, 376, 707 P.2d 484, 487 (Ct. App. 1985). A prosecuting attorney may, however, express an opinion in argument as to the truth or falsity of testimony or the guilt of the defendant when such opinion is based upon the evidence. *Phillips*, 144 Idaho at 86 n.1, 156 P.3d at 587 n.1. Nonetheless, the prosecutor should exercise caution to avoid interjecting his or her personal belief and should explicitly state that the opinion is based solely on inferences from evidence presented at trial. *Id.* The safer course is for a prosecutor to avoid the statement of opinion, as well as the disfavored phrases "I think" and "I believe" altogether. *Id.*

Further, appeals to emotion, passion, or prejudice of the jury through the use of inflammatory tactics are impermissible. *Phillips*, 144 Idaho at 87, 156 P.3d at 588; *see also State v. Raudebaugh*, 124 Idaho 758, 769, 864 P.2d 596, 607 (1993); *State v. Pecor*, 132 Idaho 359, 367, 972 P.2d 737, 745 (Ct. App. 1998). Finally, the prosecutor's closing argument should not include disparaging comments about opposing counsel. *Phillips*, 144 Idaho at 86, 156 P.3d at 587; *see also Sheahan*, 139 Idaho at 280, 77 P.3d at 969; *State v. Brown*, 131 Idaho 61, 69, 951 P.2d 1288, 1296 (Ct. App. 1998); *State v. Baruth*, 107 Idaho 651, 657, 691 P.2d 1266, 1272 (Ct. App. 1984). Whether the prosecutor's closing argument exceeds the limits and rises to the level of fundamental error must be analyzed in the context of the trial as a whole. *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 718-19, 59-60, 264 P.3d at 59-60 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Applying these standards we consider each statement to determine if misconduct occurred.

In the opening statement and closing argument the defense alluded to, and then stated, that the police were "pinning" the robberies on Williams and that the gun, ammunition, and magazine found in Williams' hotel room and car were not owned by Williams. Although the prosecution properly responded that the defense theory of the planted firearm and officer's attempt to "pin" a crime on an innocent man was unsupported by the evidence; stating that defense counsel's opening and closing remarks were ludicrous allegations, in isolation, was an improper statement. However, simply being an improper statement does not render a prosecutor's statement misconduct. Here, the prosecutor's statement that the defense's theory was ludicrous, though improper, highlighted that it was not a credible argument based on the evidence presented during trial; particularly that police did not know of Williams until they

11

found him at the hotel with a car that matched the car used in one of the robberies and that various instrumentalities of the robberies were found in Williams' possession. Thus, this statement did not amount to prosecutorial misconduct.

Next, Williams argues the prosecutor improperly interjected his personal beliefs by informing the jury he was personally offended by defense counsel's actions, as well as being offended on behalf of law enforcement for the same. While the prosecutor should have refrained from stating his personal beliefs and opinions regarding Williams' defense, the statements were based on inferences derived from evidence and testimony presented at trial. As noted above, there was adequate evidence found in Williams' possession to connect him to the robberies. Though potentially improper, the comment did not amount to prosecutorial misconduct.

Williams next argues the prosecution's statement impermissively vouched for the police officer's credibility. To rebut the defense's closing argument indicating that officers were trying to "pin" the robberies on Williams, the prosecutor stated: "What happened is exactly what they testified to. These things were legitimately found in the defendant's possession." This statement is based on inferences from testimony and evidence presented at trial. Moreover, it is specifically based on the officer's testimony. The evidence and testimony showed that not only was a matching gun found in Williams' possession, but a car matching the one used in one of the robberies was located at the hotel where Williams resided. The car had matching tires and showed that a sticker had been removed, matching the car from the April 2015 robbery. The car was registered to Williams and had been since prior to the April 2015 robbery. Consistent clothing, aviator glasses, and handkerchief face masks were found in Williams' possession. Accordingly, the statement did not amount to misconduct.

Finally, Williams challenges the prosecutor's statements that this was an example of "good police work" and "a fine job." The State argues that it was proper for the State to rebut the defense's argument that the case was about bad police work, involving planting evidence and "pinning" a crime on an innocent man. Prior to making this statement, the State referenced the implications defense counsel alluded to during opening and closing arguments regarding potential misconduct by police. Viewed in context, this statement did not constitute misconduct. Therefore, we conclude, given the context of the prosecutor's statements, no misconduct occurred during the State's closing argument, much less any constitutional violation amounting to fundamental error.

12

## C.     Right to Hybrid Representation

Next, Williams argues that Article I, Section 13, of the Idaho Constitution required the court to provide "hybrid representation" upon request, in which counsel would perform voir dire and Williams would conduct the remainder of trial pro se.  Williams claims that the district court's denial of his motion for what Williams terms "hybrid representation," or co-counsel, constituted a violation of his state constitutional right to counsel.  In support of Williams' assertion of entitlement to "hybrid" representation, Williams analogizes the Idaho Constitution to the Kentucky Constitution and invites us to follow the case law interpreting it.  The State argues that Williams failed to assert this claim below and, therefore, did not preserve it for appellate consideration.  Alternatively, the State argues that the right to counsel does not encompass a compulsory right to "hybrid" representation, but instead the decision to appoint counsel when the defendant elects to represent himself lies within the trial court's discretion.

Article I, Section 13, of the Idaho Constitution provides:  "In all criminal prosecutions, the party accused shall have the right to . . . appear and defend in person and with counsel."  We have not addressed whether this provision mandates appointment of "hybrid" representation or whether the decision is discretionary.  However, we have addressed an analogous issue--the right to appointment of counsel for a pro se litigant, or standby counsel, applying the Sixth Amendment.  Since Williams has not provided any argument as to why our state constitution should be interpreted differently than the Sixth Amendment with respect to representation, we will rely upon judicial interpretation of the Sixth Amendment in rendering our decision.  *See State v. Schaffer*, 133 Idaho 126, 130, 982 P.2d 961, 965 (Ct. App. 1999) (relying on Fourth Amendment parallel interpretation to address a state constitutional issue)*; see also Schevers v. State*, 129 Idaho 573, 578, 930 P.2d 603, 608 (1996) (applying the standard used under the Fourteenth Amendment to Article I, § 13 of the Idaho Constitution for determining whether a prison disciplinary action infringes a liberty interest).

The Sixth Amendment guarantees indigent criminal defendants the right to appointed counsel.  *State v. Jackson*, 140 Idaho 636, 639, 97 P.3d 1025, 1028 (Ct. App. 2004).  An indigent defendant may waive this right and elect to represent himself.  If such an election is made, a defendant may still request the appointment of standby counsel.  *State v. Averett*, 142 Idaho 879, 885, 136 P.3d 350, 356 (Ct. App. 2006).  This appointment of counsel for a pro se litigant however, is a discretionary decision and not an absolute right.  *Id.* at 886, 136 P.3d at 357.

13

Williams' request for "hybrid" representation is identical, for all intents and purposes, to a request for standby counsel. Thus, even if we were to assume Williams properly preserved the claim for appellate review, just as the Idaho Constitution does not provide an absolute right to standby counsel, it does not mandate "hybrid" representation to an indigent defendant who has elected to represent himself. Rather, such is a matter of discretion for the trial court.[2] *Id.* at 886, 136 P.3d at 357; *State v. Reber*, 138 Idaho 275, 277, 61 P.3d 632, 634 (Ct. App. 2002). Therefore, although Williams had a right to representation at state expense and the right to self-representation upon waiver of the right to representation by counsel, he did not have a constitutionally mandated right to "hybrid" representation. Accordingly, the district court's ruling on the request for "hybrid" representation did not infringe upon Williams' right to counsel.

## D.     Motion to be Free of Shackles During Pretrial Proceedings

Next, Williams argues the restraints he was required to wear during pretrial proceedings violated both his Fifth and Fourteenth Amendment rights to a fair trial and his statutory right to be free from pretrial punishment pursuant to Idaho Code § 19-108.[3] The State responds that the claim of error is moot because no live controversy exists which judicial relief could remedy. Further, the State argues that the district court did not err because there was no adverse effect on Williams' presumption of innocence and the court concluded the level of restraints was necessary. The State alternatively argues that if any error occurred it was harmless because it did not contribute to the verdict. Because the law is clear regarding pretrial restraints, we need not address the State's other arguments.

---

[2]     Williams does not assert that the district court abused its discretion in declining to appoint standby counsel. A party waives an issue on appeal if either authority or argument is lacking. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

[3]     Williams invites this Court to follow California precedent, which held that shackles may not be used in pretrial proceedings. *People v. Fierro*, 821 P.2d 1302 (Cal. 1991). We decline to do so. In *Fierro*, the court held that shackles could not be used in the pretrial proceedings because the eyewitness was to identify the defendant in those proceedings. The court determined that the eyewitness seeing the defendant in shackles prior to identification would violate the presumption of innocence of the defendant. *Id.* at 220. The situation in *Fierro* is factually distinct from Williams' case because Williams' pretrial proceedings were solely in the presence of the district judge, defense counsel, and the prosecutor. The same risk of an adverse effect on the defendant's presumption of innocence that was present in *Fierro* is not present here.

14

Where a defendant claims that his or her right to due process was violated, we defer to the trial court's findings of fact, if supported by substantial evidence. *State v. Smith*, 135 Idaho 712, 720, 23 P.3d 786, 794 (Ct. App. 2001). However, we freely review the application of constitutional principles to those facts found. *Id.* While the Fifth and Fourteenth Amendments prohibit the use of visible physical restraints during trial absent a determination of necessity, neither the United States Supreme Court nor the Idaho Supreme Court have extended that prohibition to pretrial proceedings. *State v. Doe*, 157 Idaho 43, 56, 333 P.3d 858, 871 (Ct. App. 2014) (concluding the same risk of prejudice of visible restraints during trial is not present at a pretrial hearing).[4]

Here, the district court determined that the constitutional standard regarding restraints in court for pretrial proceedings was not the same as in trial. There is little to no concern that pretrial restraints would have an adverse effect on Williams' presumption of innocence. *See State v. Crawford*, 99 Idaho 87, 95, 577 P.2d 1135, 1143 (1978). Though Williams argues that the restraints rose to the level of pretrial punishment in violation of Idaho Code § 19-108,[5] the district court concluded that the restraints were necessary for the pretrial hearings. In making this determination, the trial court considered the sergeant's testimony that Williams qualified for the highest level of security risk based on his past charges, his current charges, his behavior at prior correctional facilities, and violations committed during his previous prison stay. Further, Williams had physically assaulted correctional officers, had a history of significant crimes of violence, and had to be physically extracted from his cell. Additionally, Williams presented no medical evidence to support his assertion that the shackles interfered with his meaningful participation in his trial, and he had no history of anxiety attacks. Accordingly, the district court was correct in its determination that the restraints at Williams' pretrial proceedings were necessary and did not infringe on his constitutional or statutory rights. Therefore, the district court did not err in requiring Williams to wear black box shackles during his pretrial proceedings.

---

[4]    While *State v. Doe*, 157 Idaho 43, 333 P.3d 858 (Ct. App. 2014) dealt with a juvenile pretrial hearing, the same analysis is applicable to preliminary hearings involving adults. *Id.* at 56, 333 P.3d at 871.

[5]    Idaho Code § 19-108 provides: "No person can be compelled in a criminal action to be a witness against himself, nor can a person charged with a public offense be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

### E.     Motion to be Free of Restraints During Trial

Williams also argues that the presence of restraints during trial constitutionally deprived him of his right to self-represent.[6]  Specifically, Williams argues that his right was violated by limiting his ability to approach the podium, approach the jury, pace the well, or present his hand demonstratively because the leg tether would restrict his movement away from his desk during trial.  Further, Williams argues that the standard to determine whether restraints are proper changes when a defendant proceeds pro se.   The State argues a defendant's right to self-representation may be limited upon a court's determination that restraints are necessary.

A criminal defendant has a constitutional right to self-represent.  That right, however, is not absolute.  *Reber*, 138 Idaho at 277, 61 P.3d at 634.  If, in the court's discretion, it determines that it is necessary to physically restrain a defendant during trial, that limitation does not vanish upon his decision to self-represent.  *State v. Wright*, 153 Idaho 478, 484, 283 P.3d 795, 801 (Ct. App. 2012).   However, due to the "adverse effect which physical restraints [have] upon the presumption of innocence," the Due Process Clauses of both the United States and the Idaho Constitutions prohibit visibly restraining a criminal defendant at trial, absent "overriding concerns for safety or judicial decorum."   *Crawford*, 99 Idaho at 95-96, 577 P.2d at 1143-44. Using restraints on a defendant during trial is reversible error if the trial judge fails to make a finding that the restraints are necessary for physical security, to prevent escape, or to maintain court decorum, unless the State can show the error was harmless.  *Deck v. Missouri*, 544 U.S. 622, 629 (2005).

A finding that restraints are necessary may be based on both formally offered evidence admitted at trial and knowledge gained from law enforcement officers or official records.  *State v. Knutson*, 121 Idaho 101, 105, 822 P.2d 998, 1002 (Ct. App. 1991).  "Although the sheriff has some initial responsibility for determining whether an accused should be handcuffed during a jury trial, the trial judge must, in fulfilling his duty to preside over the trial, decide the question for himself." *State v. Moen*, 94 Idaho 477, 479, 491 P.2d 858, 860 (1971).   The information relied upon to support restraining a defendant should be shown on the record, outside the

---

[6]     After being denied his motion for substitute counsel, Williams expressed a desire to represent himself.  After informing Williams of the risks associated with self-representation required by *Faretta v. California*, 422 U.S. 806 (1975), the district court notified Williams he would still be required to wear restraints during trial.  Williams then withdrew his request to represent himself.

presence of the jury, and "the defendant should be afforded reasonable opportunity to meet that information." *Id.* at 480, 491 P.2d at 861. However, where a trial court fails to hold a hearing or does not specifically state the reasons for placing a defendant in restraints, we will not find an abuse of discretion so long as the record sufficiently justifies the order to restrain the defendant in a manner that would not be prejudicial. *Id.*; *Knutson*, 121 Idaho at 106, 822 P.2d at 1003.

At the pretrial proceedings, the district court determined that based on Williams' past charges, his current charges, his behavior at prior correctional facilities, and violations committed during his previous prison stay restraints were necessary. The morning of trial, the district court held a hearing regarding whether restraints were still necessary and what restraints were appropriate. The sergeant testified that Williams potentially posed a flight risk based on a conversation prior to the suppression hearing wherein Williams asked the sergeant whether the sergeant and other officers would shoot Williams if he tried to escape. Based on the evidence presented, the trial court ruled the security risks that Williams posed did not vanish when Williams invoked his right to self-representation and that the same precautions were necessary. The district court, however, determined Williams would wear a leg tether that was secured to the ground instead of the "black box shackles." Additionally, the chain would be wrapped in bicycle tubing so that no noise would be heard.

Based on the record, we conclude the district court did not abuse its discretion in determining that restraints were necessary. Williams posed a legitimate security risk. The district court made every attempt to preserve Williams' right to self-represent within the limits of public safety. Further, the court made all effort to avoid prejudice by concealing the visibility of the restraints from the jury's view as best as possible. While the tether would not allow Williams to walk as freely as he would have liked, it did not entirely limit Williams' movement. Williams would still have freedom of arms and body; the only restraint would be that Williams would be unable to move away from the desk. Even so, Williams could ask questions from his table and could face the jury when addressing them. Additionally, while the jury potentially may not have been able to see Williams' hand during opening remarks, as he would have liked, because he would be unable to move from his table, Williams would be capable of showing the jury his hand during the presentation of evidence. Accordingly, the restraints did not violate Williams' right to self-represent.

17

**F. Motions to Suppress**

Finally, Williams argues the district court erred by denying both motions to suppress evidence because the evidence was obtained through illegal means. First, Williams argues he was arrested without a warrant and without probable cause. Second, Williams argues the warrant to search his hotel room was issued on stale evidence lacking any nexus between the crime evidence sought and the location to be searched.[7] The State argues that Williams was not arrested, but only detained, and therefore neither probable cause nor a warrant was required. The State also argues the search warrant was constitutionally sufficient to permit a search of Williams' hotel room.

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

Williams first challenges the district court's findings of fact. Williams argues the district court's findings were clearly erroneous. To support his argument, Williams makes conclusory allegations that the district court simply made up and "grossly embellished" the facts. A review of the record indicates otherwise. It reflects there is sufficient evidence to support the district court's findings of fact. Accordingly, we will not disturb them on appeal.

**1. The seizure**

Williams next argues that he was illegally detained when officers handcuffed him in the parking lot of his hotel because the officers lacked probable cause to arrest him. The State argues that the detention was an investigatory stop only requiring reasonable suspicion. Further, the State argues that placing handcuffs on Williams was justified and did not transform the stop

---

[7] Williams did not initially challenge probable cause for the warrant to search the vehicle. Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). Accordingly, we will not address the issue further.

into an arrest. Finally, the State argues the discovery of the bump on Williams' hand established probable cause to arrest Williams.

The district court concluded the seizure began as an investigatory stop; that the officers had reasonable suspicion to stop Williams; that the detention was reasonable; and that Williams' detention ripened into probable cause for his arrest. We will address each conclusion in turn.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable and therefore violative of the Fourth Amendment. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995). The State may overcome this presumption by demonstrating that a warrantless search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances. *Id.* In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court created a stop-and-frisk exception to the Fourth Amendment warrant requirement. The stop and the frisk constitute two independent actions, each requiring a distinct and separate justification. *State v. Babb*, 133 Idaho 890, 892, 994 P.2d 633, 635 (Ct. App. 2000); *State v. Fleenor*, 133 Idaho 552, 556, 989 P.2d 784, 788 (Ct. App. 1999). The stop is justified if there is a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 498 (1983); *Terry*, 392 U.S. at 30; *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644 (1998); *State v. Ferreira*, 133 Idaho 474, 479, 988 P.2d 700, 705 (Ct. App. 1999).

The district court first determined that the seizure fell within this exception and was an investigatory stop and not an arrest, thus only requiring reasonable suspicion. In determining that there was reasonable suspicion to detain Williams to investigate possible criminal activity, the district court relied on the testimony from the investigating officer of the April 2015 and July 2015 robberies. The district court made specific findings of fact regarding the similarities between the robberies that surmounted to reasonable suspicion that Williams may have been involved. These findings are supported by substantial evidence, and we will not disturb them on appeal. These findings include: (1) the robberies were all at branches of the same bank in Boise; (2) the robberies all occurred within thirty minutes of the banks' opening; (3) the suspect in each was described as a Caucasian male between 5 foot 8 inches and 6 foot in height wearing a baseball hat and mirrored aviator sunglasses; (4) the suspect in both wore a color-coded windbreaker and a bandana-type mask; (5) the suspect in both made the same demand for

19

money; (6) the suspect in both quickly and easily located the tracker bills and disposed of them. Further, the discovery of certain evidence tied the robberies together, including (1) a similar vehicle as that captured on video from the April 2015 robbery was located in the hotel parking lot and registered to Williams; (2) the wheels and license plate of the vehicle also matched video footage of the April 2015 robbery; and (3) Williams approximately matched photos and eyewitness descriptions of both robbers. Objectively viewed, the officers had information sufficient to qualify as specific articulable facts justifying suspicion that Williams was the suspect involved in the robberies. The above commonalities justified the investigating officer in stopping Williams temporarily to investigate whether he had been involved in the robberies-- specifically to determine whether Williams had a bump on his left hand.

Next, we consider whether Williams' detention was reasonable. The determination of whether an investigative detention is reasonable requires a dual inquiry--whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *State v. Roe*, 140 Idaho 176, 181, 90 P.3d 926, 931 (Ct. App. 2004); *State v. Parkinson*, 135 Idaho 357, 361, 17 P.3d 301, 305 (Ct. App. 2000). An investigative detention is permissible if it is based upon specific articulable facts which justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity. *State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003). Such a detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Roe*, 140 Idaho at 181, 90 P.3d at 931; *State v. Gutierrez*, 137 Idaho 647, 651, 51 P.3d 461, 465 (Ct. App. 2002). Where a person is detained, the scope of the detention must be carefully tailored to its underlying justification. *Id.*; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. In this regard, we must focus on the intensity of the detention, as well as its duration. *Roe*, 140 Idaho at 181, 90 P.3d at 931. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. *Id.*; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. Brief inquiries not otherwise related to the initial purpose of the stop do not necessarily violate a detainee's Fourth Amendment rights. *Roe*, 140 Idaho at 181, 90 P.3d at 931.

Here, Williams was suspected of committing three robberies. In the most recent, a gun was displayed. Further, the bulletin described Williams as being armed and dangerous. The encounter occurred during the day, in a parking lot, near a busy street. Based on the totality of the circumstances, to ensure officer and public safety, the handcuffs were a reasonable safeguard

20

and were warranted for the limited stop to determine whether Williams had been involved in the robberies--specifically to determine whether Williams had a bump on his hand.

Williams also argues that the investigating officer conducted an improperly intrusive warrantless search by turning Williams' left hand to inspect it while cuffed behind his back. Williams likens this act to that in *Arizona v. Hicks*, 480 U.S. 321 (1987), wherein officers were investigating a shooting in an apartment and noticed a stereo that appeared out of place in the home. The officer moved the stereo in order to locate the serial number. *Id.* at 323. The Supreme Court concluded that the officer's action constituted a "search" requiring probable cause. *Id.* at 324. There is a distinguishable feature between the serial number on a stereo inside one's home and a physical characteristic of one's hand. The interior of one's home is fundamentally private, whereas physical attributes are constantly exposed to the public. *See United States v. Karo*, 468 U.S. 705, 715 (1984); *Katz v. United States*, 389 U.S. 347, 351 (1967); *United States v. Dionisio*, 410 U.S. 1, 14 (1973).

Here, the primary reason for the detention was to determine whether Williams had a bump on the back side of his left hand. Accordingly, the officers used the least intrusive means reasonably available to verify or dispel suspicions that Williams was the suspect involved in the bank robberies.

Finally, we must determine whether evidence discovered during the investigative detention elevated the reasonable suspicion for the detention into probable cause for an arrest. *United States v. Greene*, 783 F.2d 1364, 1368 (9th Cir. 1986). A police officer may make a warrantless arrest if a "felony has in fact been committed and he has [probable] cause for believing the person arrested to have committed it." I.C. § 19-603(3). Probable cause is the possession of information that would lead a person of ordinary care and prudence to believe or entertain an honest and strong presumption that such person is guilty. *State v. Julian*, 129 Idaho 133, 136, 922 P.2d 1059, 1062 (1996). In analyzing whether probable cause existed, this Court must determine whether the facts available to the officers at the moment of the seizure warranted a person of reasonable caution to believe that the action taken was appropriate. *Id.*; *State v. Hobson*, 95 Idaho 920, 925, 523 P.2d 523, 528 (1974). The application of probable cause to arrest must allow room for some mistakes by the arresting officer; however, the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusion of probability. *Klinger v. United States*, 409 F.2d 299, 304 (8th Cir. 1969); *Julian*, 129 Idaho at 137, 922 P.2d at

21

1063.  The facts making up a probable cause determination are viewed from an objective standpoint.  *Julian*, 129 Idaho at 136-37, 922 P.2d at 1062-63.  In passing on the question of probable cause, the expertise and the experience of the officer must be taken into account.  *State v. Ramirez*, 121 Idaho 319, 323, 824 P.2d 894, 898 (Ct. App. 1991).

Prior to Williams' detention, the officer was able to confirm the vehicle was most likely the same used in the April 2015 robbery; that the car was registered to Williams; and that Williams' DMV photograph and in-person appearance matched witness descriptions of the robber, including height, build, hair color, and nose.  During the detention, the officer also confirmed that Williams had a similar bump on his left hand in the same location as seen in the surveillance photograph from the April 2015 robbery.  Objectively and collectively viewed, these facts gave rise to probable cause to arrest Williams for the robberies.

The district court was correct in determining that the initial stop was an investigatory detention, that the officers had reasonable suspicion to detain Williams, that the detention was reasonable, and that the reasonable suspicion ripened into probable cause justifying Williams' arrest.  Accordingly, the district court did not err in denying Williams' motion to suppress any evidence discovered as a result of his detention and arrest.

### 2.    Search warrant

Williams last argues that the warrant to search his hotel room lacked probable cause based on two grounds:  (1) that the information contained in the affidavit was "stale" and (2) that the affidavit did not provide a sufficient nexus between the robberies, the items to be seized, and the hotel room registered in Williams' name.  The State argues the evidence submitted to obtain the search warrant for the hotel room was sufficient to establish probable cause that evidence of the robberies would be found in the hotel room at the time the warrant was requested.

When probable cause to issue a search warrant is challenged on appeal, the reviewing court's function is to ensure that the magistrate had a substantial basis for concluding that probable cause existed.  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983); *State v. Josephson*, 123 Idaho 790, 792, 852 P.2d 1387, 1389 (1993); *State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983).  In this evaluation, great deference is paid to the magistrate's determination.  *Gates*, 462 U.S. at 236; *State v. Wilson*, 130 Idaho 213, 215, 938 P.2d 1251, 1253 (Ct. App. 1997).  The test for reviewing the magistrate's action is whether he or she abused his or her discretion in finding that probable cause existed.  *State v. Holman*, 109 Idaho 382, 387, 707 P.2d 493, 498 (Ct.

App. 1985). When a search is conducted pursuant to a warrant, the burden of proof is on the defendant to show that the search was invalid. *State v. Kelly*, 106 Idaho 268, 275, 678 P.2d 60, 67 (Ct. App. 1984).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 17, of the Idaho Constitution is virtually identical to the Fourth Amendment, except that "oath or affirmation" is termed "affidavit." In order for a search warrant to be valid, it must be supported by probable cause to believe that evidence or fruits of a crime may be found in a particular place. *Josephson*, 123 Idaho at 792-93, 852 P.2d at 1389-90. When determining whether probable cause exists:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238; *see also Wilson*, 130 Idaho at 215, 938 P.2d at 1253.

Probable cause also necessitates a finding that evidence is probably connected with some criminal activity and that the evidence being sought can currently be found at a specific place. *State v. Turnbeaugh*, 110 Idaho 11, 13-14, 713 P.2d 447, 449-50 (Ct. App. 1985); *see also State v. Gomez*, 101 Idaho 802, 808, 623 P.2d 110, 116 (1980). Whether information regarding the presence of items in a particular place is stale depends upon the nature of the factual situation involved. *Turnbeaugh*, 110 Idaho at 13, 713 P.3d at 449. There is no magical number of days which marks the point which evidence turns from fresh to stale. *Gomez*, 101 Idaho at 808, 623 P.2d at 116. Rather, the nature of the criminal conduct controls; specifically if the activity is of a protracted or continuous nature, then a time delay in the sequence of events is less significant. For example, a half-smoked marijuana cigarette left in an ashtray at a cocktail party may be stale the day after the cleaning lady comes; yet the observance of a corpse's burial in a cellar may not be stale three decades later. *Turnbeaugh*, 110 Idaho at 13, 713 P.2d at 449.

In concluding that the material contained within the affidavit was not stale, the district court determined that because Williams was suspected of continuing criminal activity, the

23

information regarding the two 2015 robberies was sufficiently recent. Moreover, the relevant information gathered the day of the application of the warrant cured any staleness relating to the information pertaining to the 2012 robbery. As noted above, the perpetrators of the most recent robberies, April 2015 and July 2015, had many commonalities. Further, on August 8, Williams registered at the hotel. At the time the search warrant was issued, Williams had been staying at the hotel for twelve days. Parked outside that hotel was a car matching the description of the vehicle involved in the April 2015 robbery. The green adhesive on the trunk of the car in the hotel parking lot was located in the same location as the green sticker on the car in the surveillance video of the April 2015 robbery. The car was registered in Williams' name. Williams' was an out-of-state resident. Several bags were inside the hotel room. Finally, Williams' had physical attributes that matched eyewitness descriptions of the bank robbers. Taken collectively, the district court did not err in ruling the information was not stale considering the continuing nature of the three bank robberies.

Probable cause to search also requires a nexus between criminal activity and the item to be seized and a nexus between the item to be seized and the place to be searched. U.S. CONST. amend. IV; *State v. Yager*, 139 Idaho 680, 686, 85 P.3d 656, 662 (2004); *State v. Harper*, 152 Idaho 93, 100, 266 P.3d 1198, 1205 (Ct. App. 2011). Most courts require that a nexus between the items to be seized and the place to be searched must be established by specific facts, and an officer's general conclusions are not enough. *Yager*, 139 Idaho at 686, 85 P.3d at 662; *Harper*, 152 Idaho at 102, 266 P.3d at 1205. Nonetheless, even though criminal objects are not tied to a particular place by any direct evidence, an inference of probable cause to believe that they would be found in that place can be reasonable. *State v. O'Keefe*, 143 Idaho 278, 287, 141 P.3d 1147, 1156 (Ct. App. 2006); *State v. Fairchild*, 121 Idaho 960, 966, 829 P.2d 550, 556 (Ct. App. 1992). A magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense. *Harper*, 152 Idaho at 100, 266 P.3d at 1205; *State v. Belden*, 148 Idaho 277, 280, 220 P.3d 1096, 1099 (Ct. App. 2009). Moreover, the magistrate may take into account the experience and expertise of the officer conducting the search in making a probable cause determination. *Harper*, 152 Idaho at 100, 266 P.3d at 1205.

Here, the affidavit established a sufficient nexus. First, there were sufficient facts to give rise to a reasonable inference that Williams was the sole occupant of the hotel room. According to hotel records, Williams had been staying at the hotel since August 8, 2015. Further, hotel staff

24

informed officers that the person who registered the car at the hotel and registered for the room gave the name Kent Glen Williams. There is no indication that staff or officers observed any other guests coming or going from the room on a regular basis.

Moreover, the affidavit provided sufficient factual links between the robberies and the hotel room. The robberies all occurred in different branches of the same bank, within the first half hour of the bank's opening. In both 2015 robberies, the man was described as a Caucasian male, between 5 foot 8 inches and 6 foot. The man wore a "color-coordinated" long-sleeved jacket and handkerchief masks in both robberies. The man in each robbery wore mirrored aviator sunglasses. The man in both robberies used a "binding system" to hold up the handkerchief over his mouth and nose. The man in each robbery demanded that the cash be taken from two teller drawers that were hidden from regular customers. In both robberies, the man specifically asked for the money to be in denominations of twenty, fifty, and one hundred dollar bills. The man in both instructed the tellers to omit any dye, bait, or trackers. In both, the man quickly and easily identified the electronic tracker hidden inside the bills. A car matching the description of the one used in the April 2015 robbery was located at a parking lot of a hotel. The car was registered in Williams' name and had been prior to the April robbery. Williams had been staying at the hotel for approximately two weeks. Further, backpack-style bags were visible inside the hotel room. Williams matched the description of the man in both robberies.

The affidavit also stated the officer believed all three robberies were committed by the same person because of the similarities in (1) the suspect's description; (2) the suspect's clothing; and (3) the timing of the robberies. Further, the vehicle parked at the hotel was consistent with the vehicle described in the bulletin. Moreover, the vehicle from the April 2015 robbery and the vehicle, registered in Williams' name and parked at the hotel where Williams was registered shared similarities including (1) the make and model; (2) the wheels; (3) the license plate color; and (4) the location of the sticker.

Moreover, the investigating officer included photographs in his affidavit to support the basis for his belief that the same individual committed the three robberies. Additionally, the investigating officer knew that Williams had been staying at the hotel since August 8, 2015, and that items remained in that room. Though unable to see any item directly linking the contents of the hotel room with the crimes, the investigating officer could also see two backpack-style bags inside the room which appeared to contain property.

25

The record reflects there was probable cause to believe Williams would still have cash, articles of clothing, or the gun used in the robberies. Additionally, there was probable cause that evidence of the robberies would be located in the place which Williams had been staying in for the previous twelve days--his hotel room. Further, there was no reason to believe that Williams had disposed of all incriminating evidence in the days since the last robbery or that he stored it elsewhere such that there was no longer a valid belief it could be in his hotel room. Accordingly, the evidence supporting the warrant was neither stale nor lacked a nexus. Therefore, the district court did not err in determining there was probable cause to issue a warrant to search Williams' hotel room.

### III.

### CONCLUSION

Considering each issue independently, we conclude the district court did not err in denying Williams' motion to sever and motions to suppress. Further, the prosecutor did not commit misconduct in his closing argument amounting to fundamental error. Additionally, Williams' state constitutional right to counsel and statutory right to be free from excessive restraints were not violated nor were his Fifth, Sixth, and Fourteenth Amendment United States constitutional rights to a fair trial, to counsel, and to self-representation. Accordingly, Williams' judgment of conviction is affirmed.

Chief Judge GRATTON and Judge HUSKEY **CONCUR**.

26